Sandra Jean **GRIFFITH**, Plaintiff,

v.

**MT. CARMEL MEDICAL CENTER**, a Kansas Corporation; Eugene Carl McCormick, an Individual; Physician Staffing Resources, Inc., a Texas Corporation; and Judith Ulery, an Individual, Defendants.

Civ. A. No. 92–1141–MLB.

United States District Court, D. Kansas.

Aug. 23, 1993.

John W. Johnson, Render, Kamas & Hammond, Wichita, KS, Richard W Lowry, Logan & Lowry, Vinita, OK, Alan Laufman, J.D., M.D., Dallas, TX, for Sandra Jean Griffith.

Amy S. Lemley, Foulston & Siefkin, Wichita, KS, for Mount Carmel Medical Center, Inc. and Judith Ulery.

William Tinker, Jr., McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS, for Eugene Carl McCormick.

E. Dudley Smith, Fisher, Patterson, Sayler & Smith, Overland Park, KS, for Physician Staffing Resources, Inc.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendant Mount Carmel Medical Center's motion for partial summary judgment. (Doc. 183). The case arises out of events surrounding the medical treatment of plaintiff's now deceased husband, Jimmy R. Griffith, Jr., at Mount Carmel Medical Center ("Mount Carmel") in Pittsburg, Kansas. Mrs. Griffith has asserted a claim under a federal statute, the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, alleging that Mount Carmel failed to provide Mr. Griffith an "appropriate medical screening" and stabilizing medical treatment as required by the Act. Mount Carmel moves the court for an order granting it summary judgment with respect to Mrs. Griffith's EMTALA claim.[1]

## BACKGROUND

The basic facts leading up to the treatment of Mr. Griffith at Mount Carmel are largely uncontroverted. Mr. Griffith was employed as a truck driver by a Pittsburg trucking company. On May 7, 1991, while driving a tractor-trailer rig through Alabama, Mr. Griffith dozed off and his truck hit a bridge railing. Fortunately, Mr. Griffith was wearing a seatbelt and suffered what appeared to be relatively minor injuries. He was treated at an Alabama hospital immediately after the accident and subsequently released.

On the morning of Friday, May 10, 1991, Mr. Griffith arrived back home in Pittsburg. That evening, he began coughing up blood, and Mrs. Griffith took him to the Mount Carmel emergency room. Mr. Griffith was admitted to the emergency room at 7:00 p.m., and his visit was designated on the emergency room record as "self-pay" because he had no insurance. Mr. Griffith indicated that he had been coughing up blood and suffering blurry vision and a ringing in his ears since the accident in Alabama. He was attended to by nurses and the emergency room physician on duty, Dr. Eugene Carl McCormick. Dr. McCormick's "primary concern" was possible chest trauma. (Dr. McCormick's Depo., p. 60). He ordered a number of diagnostic tests, including a chest X-ray. By Dr. McCormick's own admission, however, the chest X-ray proved to be a poor diagnostic tool due to Mr. Griffith's inability or failure to breathe deeply enough while the X-ray was being taken. (Dr. McCormick's Depo., p. 71, 80-81). Despite that fact, Dr. McCormick did not order a second X-ray.[2] Dr. McCormick also failed to run an electrocardiogram (EKG) on Mr. Griffith, though he admits someone at the hospital should have done so. (Dr. McCormick's Depo., pp. 252-53). After recording diagnostic impressions and making prescriptions, Dr. McCormick discharged Mr. Griffith from the hospital approximately one and one-half hours after his arrival.

Early the next morning, May 11, 1991, Mrs. Griffith found her husband sitting on the floor and shaking, experiencing what Mrs. Griffith referred to as a "seizure." She called for an ambulance. By the time the ambulance arrived, Mr. Griffith appeared to have come out of the seizure, and Mrs. Griffith was advised to transport her husband to the hospital in her own vehicle. Mrs. Griffith immediately took her husband to the Mount

---

1. Mount Carmel admits the existence of disputed issues of material fact in connection with plaintiff's allegations of negligence against it. (Doc. 229, p. 11).

2. In response to an inquiry as to why he did not order that another X-ray be taken, Dr. McCormick indicated that he had "[n]o comment." (Dr. McCormick's Depo., p. 71).

Carmel emergency room where, as before, he was attended to by nurses and Dr. McCormick. More tests and treatment were administered, including a CT scan of Mr. Griffith's brain, a complete blood count, and an analysis of his arterial blood gases. Mr. Griffith's blood-oxygen level was found to be low, and he had to be given oxygen. According to Mrs. Griffith, her husband suffered other "seizures" or symptoms similar thereto during this time. She states that, upon observing one of these "seizures," an emergency room nurse found it necessary to hit Mr. Griffith on the chest and summon Dr. McCormick for assistance. In doing so, the nurse referred to Mr. Griffith's situation as a "code blue," apparently indicating a possible cardiopulmonary arrest. (Mrs. Griffith's Depo., pp. 86–87). Once again, no EKG was run on Mr. Griffith, despite Dr. McCormick's admission that an EKG should have been administered. (Dr. McCormick's Depo., pp. 252–53). Dr. McCormick did order that an EEG (brain wave) be taken. According to Mrs. Griffith, however, Dr. McCormick stated that because Mr. Griffith was uninsured, the EEG would have to be scheduled on an "outpatient basis." (Mrs. Griffith's Depo., p. 91). Dr. McCormick recorded a diagnostic impression of cerebral concussion and sleep apnea and discharged Mr. Griffith at 12:00 noon, approximately four and one-half hours after his arrival. Mrs. Griffith states that hospital personnel indicated her husband was not being admitted to the hospital because he was not insured. (Mrs. Griffith's Depo., pp. 183–84). Mr. Griffith was told to return to the emergency room in the event of further problems.

Mr. Griffith went home with his wife and parents. That afternoon, he began complaining of chest pains. He continued complaining of such pains that evening, but did not return to the emergency room. At approximately 10:00 p.m., Mr. Griffith passed away. The district coroner, after performing an autopsy, reported the cause of death as acute bronchitis with mucous plugging of the bronchi and acute pneumonia. Mrs. Griffith subsequently brought this wrongful death action alleging a claim against Mount Carmel under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, as well as pendent local claims for medical malpractice. Mount Carmel now moves the court for an order granting it summary judgment on Mrs. Griffith's EMTALA claim.

## STANDARDS FOR SUMMARY JUDGMENT

■■■ Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir.1991).

■■■ The burden of proof at the summary judgment stage is similar to that at trial. "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States*, 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. This burden, however, does not require the moving party to "support its motion

with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Shapolia v. Los Alamos Nat'l Laboratory,* 992 F.2d 1033, 1036 (10th Cir. 1993). The court reviews the evidence in a light most favorable to the nonmoving party, *e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## THE PARTIES' CONTENTIONS

Mrs. Griffith's EMTALA claim is based on the following provisions of EMTALA:

**§ 1395dd. Examination and treatment for emergency medical conditions and women in active labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an *appropriate medical screening examination* within the capability of the hospital's emergency department to determine whether or not an *emergency medical condition* ... exists....

**(b) Necessary stabilizing treatment for emergency medical conditions and active labor**

**(1) In general**

If any individual ... comes to a hospital and the hospital determines that the individual has *an emergency medical condition,* ..., the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required *to stabilize the medical condition,* ..., or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . . .

**(c) Restricting transfers until patient stabilized**

**(1) Rule**

If an individual at a hospital has an emergency medical condition which has not been stabilized ..., the hospital may not transfer the patient unless—

(A)(i) the individual ... in writing requests transfer ...,

(ii) a physician ... has signed a certification that ... the medical benefits ... from ... the treatment at another medical facility outweigh increased risks ...; and

(B) The transfer is an appropriate transfer

. . . .

42 U.S.C. § 1395dd(a), (b), and (c) (emphasis added).[3]

The requirements imposed by these EMTALA provisions have recently been summarized by the Tenth Circuit in the following paraphrase:

[W]hen a participating hospital has an emergency department, if "any individual" comes, or is brought, to such emergency department and requests, or a request is made on his or her behalf, for an examination or treatment of a medical condition, the hospital "must provide for an appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists" and if the hospital determines that the individual has an "emergency medical condition" it must provide either (1) within its staff and facilities for such further medical examination and treatment as is required "to stabilize the medical condition," and if the medical

---

**3.** *Subsection (e)(4) of § 1395dd, it should be noted, defines "transfer" as including the discharge of an individual from the hospital at the direction of any person employed therein. Thus,* EMTALA prohibits both the transfer and discharge of patients that are determined to have an "emergency medical condition" that has not been stabilized.

condition has not been stabilized, the hospital ... may not transfer the individual elsewhere, or (2) transfer the individual to another medical facility in accordance with another provision of the statute.

*Collins v. DePaul Hosp.,* 963 F.2d 303, 305 (10th Cir.1992). The Tenth Circuit, like most courts, has interpreted EMTALA as essentially imposing two duties giving rise to two different types of claims: "improper screening examination" and "transfer before stabilization." *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 680 (10th Cir. 1991); *see also Collins,* 963 F.2d at 307–08 (noting the " 'two primary ways' " in which a hospital can violate EMTALA) (quoting *Deberry v. Sherman Hosp. Ass'n,* 741 F.Supp. 1302, 1305 (N.D.Ill.1990)); *Brooks v. Maryland General Hospital, Inc.,* 996 F.2d 708, 711 (4th Cir.1993).

In the present case, Mrs. Griffith, like the plaintiff in *Abercrombie,* has asserted both types of EMTALA claims. 950 F.2d at 680. First, she claims that her husband did not receive an "appropriate medical screening examination," as required by § 1395dd(a), on both his May 10th and May 11th visits to the emergency room at Mount Carmel. According to Mrs. Griffith, the screenings given to her husband by Mount Carmel were different than the screenings that would have been received by insured patients with similar medical circumstances. (Pretrial Order, Doc. 254, pp. 17–18). She alleges that the screening decisions made by both Dr. McCormick and the nurses on duty, including the decision not to administer an EKG, deviated from "standard hospital policy," and that this deviation was motivated by the fact that her husband was uninsured. (Pretrial Order, Doc. 254, pp. 18–19). Second, Mrs. Griffith claims that, despite their failure to render an appropriate medical screening, Mount Carmel emergency room personnel did determine that her husband was in an "emergency medical condition," within the meaning of § 1395dd(e)(1). (Pretrial Order, Doc. 254, pp. 19–20). According to Mrs. Griffith, Mount Carmel nevertheless failed to provide the medical treatment necessary to stabilize her husband's condition, as mandated by § 1395dd(b). (Pretrial Order, Doc. 254, pp. 20–22).

Mount Carmel seeks an order granting it summary judgment on both of the claims that Mrs. Griffith has asserted under EMTALA. Mount Carmel contends that Mrs. Griffith is actually not asserting an EMTALA claim at all, but has merely presented evidence of an alleged misdiagnosis, sufficient only to state a claim of medical malpractice. (Doc. 229, pp. 11–15). Pointing to the congressional purpose underlying EMTALA, Mount Carmel argues that EMTALA merely requires that hospitals provide *access* to a medical screening and does not create a statutory guarantee of an accurate diagnosis. (Doc. 156, pp. 8–10, 12; Doc. 229, pp. 8–9). Based on this analysis of EMTALA and its contention that Mrs. Griffith has only presented evidence that her husband was misdiagnosed, Mount Carmel asserts that Mrs. Griffith's "appropriate medical screening" claim cannot stand. (Doc. 156, p. 19; Doc. 229, p. 23). Mount Carmel further argues that, at most, EMTALA simply requires hospitals to provide the same screening to all patients in similar medical circumstances. (Doc. 229, p. 15). According to Mount Carmel, the uncontroverted evidence indicates plaintiff's husband was given the same medical screening that would have been given to any similarly situated patient at Mount Carmel, whether insured or not. (Doc. 229, p. 15–19). Mount Carmel therefore maintains it is entitled to summary judgment on Mrs. Griffith's claim that Mount Carmel failed to give her husband an "appropriate medical screening."

With respect to Mrs. Griffith's claim that her husband's condition was not stabilized prior to his being discharged, Mount Carmel contends that, because it never *actually* determined that Mr. Griffith had an "emergency medical condition," it was never obligated to provide stabilizing treatment. (Doc. 156, pp. 18–19; Doc. 229, pp. 20–23). Moreover, Mount Carmel generally argues that the uncontroverted evidence indicates Mount Carmel's emergency department provided extensive medical care and treatment to Mr. Griffith. (Doc. 156, p. 9). Hence, according to Mount Carmel, it is entitled to summary judgment on Mrs. Griffith's stabilizing treatment claim as well.

In response to Mount Carmel's motion, Mrs. Griffith asserts that the following genuine issues of material fact remain and necessarily preclude summary judgment: (1) whether Mount Carmel provided an appropriate medical screening; (2) whether the hospital actually determined that Mr. Griffith had an emergency medical condition; (3) whether Mr. Griffith was given the requisite stabilizing treatment prior to being discharged; and (4) whether Mr. Griffith's condition had in fact stabilized prior to discharge. (Doc. 181, pp. 24–33). The crucial issue in determining whether Mount Carmel's motion for partial summary judgment should be granted is essentially whether any of these questions of fact do remain to be decided. In the court's opinion, these questions do remain, and Mount Carmel's motion for summary judgment must accordingly be denied.

### DISCUSSION

■ As discussed *supra*, Congress expressly limited recovery under EMTALA to circumstances in which a plaintiff did not receive an "appropriate" screening and/or was not "stabilized" before being transferred or discharged. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990). The standards applicable in determining both of these types of EMTALA claims, however, are not altogether clear. For analytical purposes, the two types of claims asserted by plaintiff in the present case will be handled separately.

#### A. Failure to Give an "Appropriate Medical Screening"

The language of EMTALA itself provides little help in determining when an "appropriate medical screening" has been given. Congress did not define the term "appropriate medical screening" in EMTALA. The use of

the word "appropriate" seems to render the term capable of infinite interpretations. *Cleland*, 917 F.2d at 271 (referring to "appropriate" as "one of the most wonderful weasel words in the dictionary"). The statutory language does indicate, as the Tenth Circuit has held, that the *purpose* of the screening is "to determine whether an 'emergency medical condition exists.' Nothing more, nothing less." *Collins*, 963 F.2d at 307; *see Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 (4th Cir.1992). That term *is* defined in EMTALA:

> The term "emergency medical condition" means—
>
> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> > (i) placing the health of the individual ... in serious jeopardy,
> >
> > (ii) serious impairment of bodily functions, or
> >
> > (iii) serious dysfunction of any bodily organ or part.
>
> . . . .

Based solely on the language of the statute, so long as the medical screening procedure provided was sufficiently calculated to ascertain the existence of such a condition, EMTALA would not appear to be violated.[4]

In addition to the statutory language, however, courts have looked to the legislative purpose underlying EMTALA in handling appropriate medical screening claims. The Fourth Circuit recently offered the following explanation of the congressional intent behind EMTALA:

> EMTALA was passed by Congress in 1986 in response to a growing concern that hospitals were "dumping" patients unable to pay, by either refusing to provide emergency medical treatment or transferring

---

**4.** The plain language of § 1395dd alone undermines Mount Carmel's argument that the "appropriate medical screening" requirement in EMTALA merely requires a hospital to give uninsured patients "access" to medical screening examinations. That is clearly an understatement of the duty imposed by EMTALA. At a minimum, the statutory language requires the hospital to give a screening *to determine whether an emer-*

*gency medical condition exists.* If the screening given is not intended and calculated to meet this objective, then it can hardly be called an "appropriate medical screening." *See Deberry v. Sherman Hosp. Ass'n*, 741 F.Supp. 1302, 1306–07 (N.D.Ill.1990) ("[T]he statute clearly goes beyond merely prohibiting a hospital from turning away an indigent at the emergency room door.").

patients before their emergency conditions were stabilized. The Act was not designed to provide a federal remedy for misdiagnosis or general malpractice. Rather, Congress expressed concern that hospitals were abandoning the longstanding practice of providing emergency care to all due to increasing pressures to lower costs and maximize efficiency. Under traditional state tort law, hospitals are under no legal duty to provide this care. Accordingly, Congress enacted EMTALA to require hospitals to continue to provide it.

*Brooks v. Maryland General Hospital, Inc.,* 996 F.2d 708, 710 (4th Cir.1993); *see also Stevison by Collins v. Enid Health Systems, Inc.,* 920 F.2d 710, 713 (10th Cir.1990); *Stewart v. Myrick,* 731 F.Supp. 433, 435–36 (D.Kan.1990) (quoting extensively from EMTALA's legislative history). Given this congressional purpose, courts have consistently concluded that, although EMTALA does not create a federal remedy encompassing the "full panoply of state medical malpractice law," it is intended to ensure that each patient is accorded the same level of treatment regularly provided to patients in similar medical circumstances. *Cleland,* 917 F.2d at 269–72; *see Collins,* 963 F.2d at 307; *Baber,* 977 F.2d at 879–81; *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991). Accordingly, the standards applied to adjudicate both appropriate medical screening and stabilizing treatment claims have been developed with this congressional purpose in mind.

With regard to appropriate medical screening claims, the courts appear to have developed two tests. First, in *Cleland,* 917 F.2d at 271–72, looking to the aforementioned congressional intent behind EMTALA, the Sixth Circuit held that "appropriate" should be interpreted to "refer to the motives with which the hospital acts:"

If a hospital refused treatment to persons for any of these reasons [indigency, race, sex, etc.], or gave cursory treatment, the evil inflicted would be quite akin to that discussed by Congress in the legislative history, and the patient would fall squarely within the statutory language. On the other hand, if ... a hospital provides care to the plaintiff that is no different than would have been offered to any patient, and, from all that appears, is "within its capability" (that is, constitutes a good faith application of the hospital's resources), then the words "appropriate medical screening" in the statute should not be interpreted to go beyond what was provided....

*Id.* at 272.

Second, in *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991), the D.C. Circuit held that "what constitutes an 'appropriate' screening is properly determined ... by reference to a hospital's standard screening procedures.... [A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act." *See also Baber v. Hospital Corp. of America,* 977 F.2d 872, 881 (4th Cir.1992); *Power v. Arlington Hosp.,* 800 F.Supp. 1384, 1387 n. 6 (E.D.Va.1992) ("[T]he issue is ... whether the claimant received the same screening examination regularly provided to other patients in similar circumstances."). Under this particular test, differential treatment of a patient is in and of itself enough to incur liability, without regard to motive.[5] *Gatewood,* 933 F.2d at 1041 n. 3; *see also Jones v. Wake County Hosp. System, Inc.,* 786 F.Supp. 538, 544 (E.D.N.C.1991) (discussing this "difference" between the *Cleland* and *Gatewood* standards).

■ The court does not view these tests as mutually exclusive and declines to adopt one or the other as the law of this case. When, as here, the hospital does not have a standard screening procedure, the plaintiff will have to establish (1) what an appropriate medical screening examination, within the capability of the hospital's emergency department, would have been to determine whether an emergency condition existed, and (2) that the hospital departed from that appropriate

---

5. It is noteworthy that, in both *Cleland* and *Gatewood,* the patient was fully insured. 917 F.2d at 269; 933 F.2d at 1039. In addition, while it is not absolutely clear, it may be that both hospitals had standard screening procedures. These are important factual distinctions from the present case which blur any bright line between the tests set forth in *Cleland* and *Gatewood.*

examination.[6] Ultimately, Mrs. Griffith will have to prove that the screening provided to her husband was different than the screening Mount Carmel would have provided to another patient who had similar symptoms or a similar condition. The court does not find that proof of the hospital's motive, if any, is an essential element of the plaintiff's case. However, evidence of motive may be relevant. If, for example, the hospital utilized different screening procedures depending upon whether a patient was insured, its motive for doing so could be relevant.

■ In any event, under either the *Gatewood* or *Cleland* test there appear to be genuine issues of material fact concerning whether the medical screening provided to Mr. Griffith was "appropriate" within the meaning of EMTALA. Mrs. Griffith has specifically alleged both that Mount Carmel did not provide her husband with the same medical screening and treatment it regularly provided to other patients in similar medical circumstances and that this disparate treatment was motivated by the fact that her husband was uninsured. These allegations are supported by specific facts set forth in the record and are, therefore, sufficient to avoid summary judgment:

1. Mrs. Griffith points to Mount Carmel's failure to administer an EKG on both May 10th and 11th as a screening procedure which appears to have deviated from the care that Mount Carmel would ordinarily have given to other similarly situated patients. (Doc. 181, p. 29). Mrs. Griffith alleges that the standard policies of Mount Carmel called for running an EKG on a patient who had symptoms and a medical history like her husband's. (Doc. 181, p. 5–6, 29; Doc. 228, p. 3–5). Mount Carmel counters by contending that Dr. McCormick did not administer an EKG because he did not believe Mr. Griffith was suffering from a cardiac arrest or other condition for which an EKG would have been "appropriate." Dr. McCormick's deposition testimony, however, suggests otherwise:

Q. Why didn't you do an EKG on Mr. Griffith in the emergency room, Doctor, on either the 10th or the 11th?

A. I don't have a good answer to that. I suspect they had the EKG monitor on him on the 11th..... Quite often when they come in like with seizures, their standard policy is to put the bedside EKG monitor on the patient.

. . . .

Q. Is there any reason why that type of EKG was not run on this patient, Mr. Griffith, to screen him for the possibility of cardiac problems?

A. I know of no good reason why it was not run.

. . . .

Q. Isn't it fair to say that an EKG should have been run on Mr. Griffith on the 10th if not the 11th?

A. Yes.

(Dr. McCormick's Depo., p. 251–52). This testimony belies Mount Carmel's contention. It indicates, at the very least, that the screening examination given to Mr. Griffith may not have been as careful and thorough as that given to other similarly situated patients and calls into question the reasons behind the decision not to run an EKG on Mr. Griffith. *See Power v. Arlington Hosp.*, 800 F.Supp. 1384, 1387 n. 6 (E.D.Va.1992) (denying summary judgment where the plaintiff showed facts suggesting that the screening examination she received was not as "thorough and careful" as that received by other patients). In another portion of his deposition, Dr. McCormick states that his emergency room treatment decisions are never based on the status of the patient as insured or uninsured and indicates he never knew Mr. Griffith was uninsured. (Dr. McCormick's Depo., p. 142). By affidavit, Dr. McCormick further avows that "the care and treatment [he] provided to Mr. Griffith was the same as the care and treatment [he] would have provided to any other patient with the same medical condition." (Affidavit of Eugene Carl McCormick, p. 3). These

---

**6.** Mount Carmel has admitted it had no applicable standard screening procedures. See discussion *infra*.

self-serving statements, however, do not explain away Dr. McCormick's testimony concerning the hospital's failure to administer an EKG. Moreover, they do not account for statements allegedly made by Dr. McCormick and other Mount Carmel personnel suggesting that Mr. Griffith's being uninsured may have played a role in the screening and treatment that he received.

2. Mrs. Griffith alleges that it was standard practice in the Mount Carmel emergency room to hospitalize a patient who, like her husband, was apparently suffering a cardiac arrest. (Doc. 228, p. 4). In pleadings and in her deposition, Mrs. Griffith further states that, on May 11th, a nurse or hospital clerk told her that her husband would not be admitted because he was uninsured. (Doc. 181, p. 7; Mrs. Griffith's Depo., pp. 175–80, 183–84). She also points to the deposition testimony of a Mount Carmel emergency room clerk indicating Mrs. Griffith expressed a desire for her husband to be admitted to the hospital on May 11th, but was met with reluctance due to her husband's uninsured status. (Ellen Rider's Depo., pp. 42–43, 54–55; Mrs. Griffith's Depo., p. 92).

Mount Carmel argues that Dr. McCormick did not diagnose Mr. Griffith as suffering from a cardiac arrest and, as a result, did not think it was necessary for Mr. Griffith to be admitted. (Doc. 229, p. 18). Furthermore, according to Mount Carmel, the nurses or clerks who allegedly indicated Mr. Griffith was not being admitted due to his uninsured status had no authority to make admission decisions. Mount Carmel generally maintains that it "took [Mr. Griffith] in and cared for him in the same manner it would have cared for any other patient with a [similar] diagnosis." (Doc. 229, p. 17).

On summary judgment, this court is required to review the evidence presented in a light most favorable to the nonmoving party. Viewing Mrs. Griffith's evidence in such a manner, there is clearly a question of fact as to whether Mount Carmel's decision not to admit Mr. Griffith was motivated by the fact that he was uninsured. Although Mount Carmel has provided a possible legitimate explanation concerning why Mr. Griffith was not admitted, it has not explained the deposition testimony and alleged statements of its nurses and/or clerks suggesting, at the very least, that Mr. Griffith's uninsured status was also a motivating factor. These statements cast doubt on Mount Carmel's assertion that it gave Mr. Griffith the same screening and treatment it would have given to another similarly situated patient.

3. Mrs. Griffith also alleges that, although Dr. McCormick ordered that an EEG (brain wave) examination be conducted on her husband on May 11th, he deferred the examination until May 13th because her husband did not have insurance. (Doc. 181, p. 29). In her deposition, Mrs. Griffith states that Dr. McCormick told her the EEG would be scheduled on an "outpatient basis" because it had to be done as "charity." (Mrs. Griffith's Depo., p. 91). Mount Carmel, however, claims that EEGs can only be performed at Mount Carmel on weekdays, and for that reason Mr. Griffith's EEG was scheduled for Monday, May 13th. (Doc. 229, p. 19). Moreover, Mount Carmel points out that the results of an EEG have to be sent to the University of Kansas Medical Center in Kansas City before they can be interpreted and that sending the results out on a weekend would have been impractical. (Dos. 229, p. 19).

Mount Carmel's proffered explanation concerning the scheduling of Mr. Griffith's EEG makes sense. The deposition testimony of Dr. McCormick indicates that EEGs were routinely scheduled ahead of time, corroborating Mount Carmel's position. (Dr. McCormick's Depo., p. 143). Nevertheless, the court is to some degree bound to lend credence to Mrs. Griffith's deposition testimony. Her testimony clearly raises the possibility that Mr. Griffith's lack of insurance may have motivated the scheduling of his EEG examination.

In summary, in addition to the basic facts concerning her husband's medical situation during his visits to the Mount Carmel emergency room, Mrs. Griffith has set forth evidence concerning Mount Carmel's failure to administer an EKG examination, failure to admit Mr. Griffith, and failure to promptly schedule an EEG. She has also pointed to Dr. McCormick's unexplained failure to take

a second X-ray of her husband's chest on May 10th. (Doc. 181, p. 29). Mrs. Griffith alleges that other similarly situated patients would have been given different, more thorough screening and treatment. With respect to motivation, Mrs. Griffith alleges Mount Carmel personnel made statements indicating that her husband was being denied certain treatment because of his lack of insurance. Taken together, this evidence suggests both that the screening given to Mr. Griffith may have deviated from that given to other patients and that screening decisions may have been motivated in part by the fact that Mr. Griffith was uninsured.

By contrast, in several of the cases cited by Mount Carmel, the plaintiffs against whom a motion for dismissal or summary judgment was granted simply failed to allege or show facts indicating either differential treatment or improper motivation on the part of the defendant hospital. *Baber*, 977 F.2d at 881 ("[Plaintiff] does not allege that [hospital's] emergency department personnel treated [his wife] differently from its other patients. Instead, he merely claims [the doctor] did not do enough accurately to diagnose her condition or treat her injury."); *Gatewood*, 933 F.2d at 1041 ("[Plaintiff's] allegations of misdiagnosis, without more, are simply not cognizable under the Emergency Act.... Absent some allegation of differential treatment, no claim is stated under subsection 1395dd(a)."); *Cleland*, 917 F.2d at 271 ("[T]here is not the slightest indication that this outcome would have been any different for a patient of any other characteristics.... [T]he complaint simply fails to allege any inappropriateness in the medical screening in the sense required by the Act."); *Petrovics v. Prince William Hosp. Corp.*, 764 F.Supp. 415, 418 (E.D.Va.1991) ("[T]he plaintiff in this case has not alleged any inappropriateness in the screening that he received such that any other patient would have received different screening."); *Stewart*, 731 F.Supp. at 434 ("It is uncontroverted that [plaintiff] was never denied treatment or discharged from [the hospital] due to lack of insurance."); *Evitt v. University Heights Hosp.*, 727 F.Supp. 495, 498 (S.D.Ind.1989) ("[P]laintiff has been unable to present evidence which could prove that she was turned away from the Hospital for economic reasons....").[7]

In each of these cases, the plaintiff's EMTALA claim was based solely on the failure of the hospital's emergency room personnel to make a proper diagnosis. *Baber*, 977 F.2d at 881; *Gatewood*, 933 F.2d at 1041; *Cleland*, 917 F.2d at 269; *Petrovics*, 764 F.Supp. at 418; *Stewart*, 731 F.Supp. at 434–46; *Evitt*, 727 F.Supp. at 497.[8] In the present case, Mrs. Griffith has presented evidence, including the alleged statements of hospital personnel discussed *supra*, suggesting that more than a mere misdiagnosis was involved.

Mount Carmel has admitted it has no standard policies dictating the medical screening that a patient with Mr. Griffith's symptoms should receive. Mount Carmel cannot, however, simply hide behind this lack of standard emergency room procedures.[9] Mrs. Griffith

---

**7.** In addition, a recent Tenth Circuit case relied on by Mount Carmel, *Collins v. DePaul Hosp.*, 963 F.2d 303 (10th Cir.1992), is easily distinguishable from the present case. In *Collins*, the plaintiff claiming that the hospital had given him an inadequate screening examination was actually admitted to the hospital and given extensive medical treatment over a period of twenty-six days. 963 F.2d at 306, 308.

**8.** See also *Nash v. Wilkinson*, 1992 WL 163666, *4 (D.Kan.1992), where the court, Chief Judge Kelly presiding, held that the plaintiff's complaint "attacked the physician's provisional diagnosis rather than 'patient dumping,' the act which the statute was implemented to deal with."

**9.** Mount Carmel has presented the following argument to the court:

[Plaintiff] requested Mount Carmel to admit that it had no policies dictating the treatment a patient must receive when present[ed] with the decedent's symptoms, and Mount Carmel did so. That being the case, plaintiff has no evidence that Mount Carmel treated the decedent any differently than it would have anyone else. Under these circumstances, the testimony of Dr. McCormick to the effect that he did not treat the decedent differently requires that the Court grant summary judgment to Mount Carmel on plaintiff's EMTALA claim based on a failure to treat.

(Doc. 229, pp. 18–19). If accepted, this argument's logical end would be to encourage hospitals not to develop standards for the express purpose of avoiding liability. That was certainly not the desired effect of EMTALA. For this and

should be allowed to look to sources other than the express standard policies of Mount Carmel in attempting to show that the screening Mount Carmel gave her husband was different than the screening it would have offered to other patients. In *Power v. Arlington Hosp.*, 800 F.Supp. 1384, 1387 n. 6 (E.D.Va.1992), the court specifically held that, in the absence of standard screening procedures, a plaintiff may look to other evidence of differential treatment, including "failure to meet the standard of care to which the [h]ospital adheres," in asserting an appropriate medical screening claim. Thus, the means by which Mrs. Griffith may prove that her husband did not receive an appropriate medical screening are not limited by Mount Carmel's lack of standard screening procedures. Other evidence suggesting differential treatment may be presented. At any rate, the evidence presented by Mrs. Griffith, including statements allegedly made by Mount Carmel emergency room personnel, is sufficient to raise a question of fact as to whether Mount Carmel's screening of Mr. Griffith was "appropriate."

■ Furthermore, contrary to Mount Carmel's argument, this court does not have to adopt a standard for appropriate medical screening claims that is equivalent to the applicable medical malpractice standard in order to deny summary judgment in this case. The same evidence that supports a medical malpractice claim under state law may, in some circumstances, also constitute evidence of differential treatment sufficient to support a claim for failure to give an "appropriate medical screening" under EMTALA. The *Power* court offered the following illustration of this fact:

> Consider a situation in which a hospital adheres to a standard [of care] requiring tests A, B, and C as part of an appropriate medical screening. In many instances, this standard will also be the malpractice standard of care. Thus, failure to perform test C, for example, would violate both EMTALA and the standard applicable in a

malpractice claim. But if tests A, B, and C are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be.

*Id.* Thus, Mrs. Griffith's medical malpractice and EMTALA medical screening claims are not necessarily mutually exclusive. For instance, the evidence Mrs. Griffith has presented concerning Mount Carmel's failure to administer an EKG may be used to support both her medical malpractice and EMTALA medical screening claims.

■ Mount Carmel also contends that whether the medical screening given to Mr. Griffith was "appropriate" is as much a question of law as it is a question of fact. (Doc. 229, p. 4). Most courts, however, including the Tenth Circuit, treat this determination as a question for the trier of fact. In *Abercrombie v. Osteopathic Hospital Founders Ass'n*, 950 F.2d 676, 680 (10th Cir.1991), the Tenth Circuit approved the portion of a jury instruction which asked the jury to determine if an appropriate medical screening had been performed. Moreover, on its face, the question of whether Mount Carmel provided Mr. Griffith the same emergency room screening it would have provided another patient in similar medical circumstances appears to be one of fact.

### B. Discharge Without Stabilizing Treatment

■ Likewise, with regard to Mrs. Griffith's claim that Mount Carmel failed to give her husband the stabilizing treatment required by § 1395dd(b)(1)(A), there appear to be remaining pertinent questions of fact. As Mount Carmel correctly points out, EMTALA's stabilization requirement comes into play only after a diagnosis of an "emergency medical condition" is made. Thus, as a prerequisite to her stabilization claim, Mrs. Griffith must show that, at some point, Mount Carmel actually determined her husband had an "emergency medical condition" as defined in § 1395dd(e)(1).[10] Mount Carmel contends

other reasons discussed *infra,* Mount Carmel's argument is rejected.

**10.** See *supra.* There is some wrangling between the parties as to whether § 1395dd(b)(1) requires

an *actual* determination by the hospital that there is an emergency medical condition. Mrs. Griffith, in fact, contends that the Tenth Circuit does not take this view. However, insofar as the

that it never made such a determination. Accordingly, Mount Carmel argues that, even if the court denies it summary judgment on Mrs. Griffith's appropriate screening claim, it must nevertheless grant summary judgment on the claim that Mount Carmel violated EMTALA by failing to stabilize Mr. Griffith before his discharge.

In his affidavit, Dr. McCormick states that, on both May 10th and 11th, he determined Mr. Griffith had a "non-emergent" condition. (Affidavit of Eugene Carl McCormick, pp. 2–3). The court, however, is not bound to accept Dr. McCormick's statement. The court is, instead, bound to view the evidence presented in a light most favorable to Mrs. Griffith, the nonmoving party, and to apply that evidence to the definition of an "emergency medical condition" set forth in the statute.[11] Mrs. Griffith has specifically alleged that Mount Carmel *did* determine that her husband had an "emergency medical condition." She points to the emergency room records and testimony of Dr. McCormick indicating that, on both May 10th and 11th, Mr. Griffith was experiencing symptoms which would appear to raise a question of fact as to whether or not Mount Carmel personnel actually determined that Mr. Griffith had an "emergency medical condition." On May 10th, Mr. Griffith was found to be coughing up blood and experiencing chest pain and possible chest trauma. He informed hospital personnel that he had been in a vehicular accident a few days earlier. On May 11th, Mr. Griffith was suffering seizure-type activity and had a low blood-oxygen level. Moreover, according to Mrs. Griffith, an emergency room nurse had to strike her husband on the chest to bring him out of a "seizure" and referred to her husband's medical situation as a "code blue," apparently indicating that Mr. Griffith was thought to be

suffering a cardiopulmonary arrest. It is hard to imagine such a situation not being considered an "emergency medical condition" within the meaning of EMTALA.[12] With this in mind, prudence would appear to counsel toward allowing a jury to decide whether Mount Carmel personnel did in fact determine that an "emergency medical condition" existed.

Mrs. Griffith has also presented evidence suggesting that Mount Carmel did not provide stabilizing medical treatment prior to discharging her husband. According to EMTALA, an individual has been "stabilized" and may be discharged when "no material deterioration of [his] condition is likely, within reasonable medical probability." 42 U.S.C. § 1395dd(e)(1)(B). Mrs. Griffith contends that her husband was not given treatment necessary to prevent a deterioration in his condition, within a reasonable medical probability, and should have been admitted to the hospital for continued observation and treatment.

In light of Mr. Griffith's medical situation, particularly on the morning of May 11th, and his death later that same day, it would appear that Mrs. Griffith has set forth evidence sufficient to raise a question of fact as to whether her husband's condition was "stabilized" at the time he was discharged from Mount Carmel. A recent District of Kansas and Tenth Circuit case is instructive in this regard. In *Delaney v. Cade*, 986 F.2d 387 (10th Cir.1993), the Tenth Circuit reversed a partial summary judgment that had been granted by Judge Crow on an EMTALA stabilizing treatment claim. In this case, there was confusion as to whether the plaintiff had actually even alleged that her condition was not "stabilized" at the time of her transfer to another hospital. *Id.* at 392–93. Even so, the Tenth Circuit found that the

---

Court can tell, she offers no authority for this contention. In light of the statutory language and the holdings of other Circuits, this Court concludes that Mrs. Griffith must show that Mount Carmel *actually determined* that her husband had an emergency medical condition before she may recover on her stabilization claim. *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir. 1991); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268–69, 272 (6th Cir.1990).

**11.** See *supra.*

**12.** Specifically, a possible cardiopulmonary arrest and low levels of oxygen in the blood would appear to present a situation in which the health of a patient could reasonably be expected to be placed in "serious jeopardy" in the "absence of immediate medical attention." *See* 42 U.S.C. § 1395dd(e)(1)(A)(i).

"state of the evidence" was sufficient to "put into question" the stabilization issue. *Id.* at 393. That is no less true in the present case.[13]

In summary, given the number of factual issues raised by the evidence Mrs. Griffith has presented to support her two types of EMTALA claims, summary judgment cannot appropriately be granted on either claim in the present case. There is sufficient evidence from which a jury could legitimately infer that Mr. Griffith was not given the same medical screening afforded to other patients in similar medical circumstances and that Mount Carmel, after determining that Mr. Griffith had an emergency medical condition, did not stabilize Mr. Griffith before he was discharged.

IT IS ACCORDINGLY ORDERED, this 23rd day of August, 1993, in Wichita, Kansas, that defendant Mount Carmel's motion for partial summary judgment (Doc. 183) is hereby denied.

**13.** In *Delaney*, the plaintiff apparently suffered a loss of feeling and movement in her legs while being transported from a Larned hospital to Central Kansas Medical Center in Great Bend. *Id.* at 388–89. Her chief claim was that a delay in the transfer had deprived her of the chance for a better recovery, not that the hospital failed to stabilize her prior to the transfer. *See id.* at 389. Nevertheless, the Tenth Circuit found that the mere evidence that plaintiff's condition had actually "materially deteriorated" during her transfer was enough to avoid summary judgment on her stabilization claim. *Id.* at 393. Similarly, in this case, as to whether Mr. Griffith's condition was stabilized before he was discharged, the mere evidence that, only ten hours later, he died, coupled with other evidence concerning his condition while at the Mount Carmel emergency room, is enough to avoid summary judgment on Mrs. Griffith's stabilization claim.