**Mary Ann ROMO, Administratrix of the Estate of Alvaro M. Romo; and Mary Ann Romo, Plaintiffs,**

v.

**UNION MEMORIAL HOSPITAL, INC.; Robert R. Farquharson, M.D.; and Edward B. Bower, M.D., Defendants.**

No. 3:93–cv–239–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Feb. 8, 1995.

*New York City Police Dept.,* 115 F.R.D. 220, 232 (S.D.N.Y.1987).

Charles G. Monnett, III, Monnett, Barry & Roberts, William H. Elam, Wishart, Norris, Henninger & Pittman, Charlotte, NC, for plaintiffs.

J.A. Gardner, III, Hedrick, Eatman, Gardner & Kincheloe, Charlotte, NC, Kenneth B. Rotenstreich, Teague, Rotenstreich & Stanaland, Greensboro, NC, Paul A. Reichs, Charlotte, NC, for defendants.

## *ORDER*

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on motion of Defendant, Union Memorial Hospital, Inc., filed January 13, 1995, for summary judgment with respect to Plaintiff's Emergency Medical Treatment and Active Labor Act ("EMTALA") claims. Plaintiff filed a brief in opposition to Defendant's motion for summary judgment on January 27, 1995. The Court has reviewed the motion for summary judgment and the briefs filed in support of and in opposition to the motion, as well as the relevant legal authorities. Based upon its review of this case, the Court makes the following findings of facts and conclusions of law.

### *Factual Background*

The claim arises from an unfortunate episode which began on January 2, 1992 and

culminated with Mr. Romo's death at CMC on January 5, 1992. On January 2, 1992 Alvaro Romo presented himself to Union Memorial Hospital with complaints of vomiting and abdominal pain. He was examined, diagnosed with gastroenteritis, and subsequently discharged with instructions to follow up with his family physician.

On January 4, 1994, at approximately 8:25 p.m., Romo again presented himself to the Union Memorial Hospital complaining of right-sided abdominal pain with chills and nausea. His vital signs, including temperature, pulse, blood pressure and respirations, were taken and recorded at 8:30 p.m. The medical records, attached at Defendant's Exhibit C, indicate that an evaluation was performed by Dr. Farquharson and that numerous tests and procedures were initiated and performed on Mr. Romo. Plaintiff contends that the record also indicates that there is a period of one and one-half hours wherein the Union Memorial nurses failed to check and record any of Romo's vital signs and a gap of four hours and twenty minutes in checking and recording Romo's temperature and respirations. (Plaintiff's Exhibit C at 9–10).

Sometime later, Dr. Farquharson consulted Dr. Bower by telephone and Dr. Bower arrived at the hospital at approximately 11:30 p.m. Dr. Bower evaluated Romo and concluded, in part, that Romo needed monitoring available in an ICU/CCU bed. Apparently after determining that no ICU/CCU beds were available at Union Memorial Hospital, the decision was made to transfer Romo to CMC. The arraignments were made by Dr. Farquharson and Romo was transported to the CMC via ambulance at approximately 1:30 a.m., on January 5, 1992. Romo arrived at CMC at 2:06 a.m., and was diagnosed with a probable perforated appendix c sepsis. Subsequently, at around 4:30 a.m., Romo suffered a cardiac arrest, was resuscitated, underwent surgery, and expired during that procedure.

*Summary Judgment Standard*

 Summary judgment is appropriate when the pleadings, responses to discovery, and the record reveal that no genuine issue of any material fact exists and that the mov-

ing party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing that no genuine issue of any material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). After the moving party has met its burden, the non-moving party must come forward with specific facts showing that evidence exists to support its claims and that a genuine issue for trial exists. *Id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see* Fed.R.Civ.P. 56(e) (in response to motion for summary judgment, "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). When considering motions for summary judgment, courts must view facts and inferences in the light most favorable to the party opposing the motion for summary judgment. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). When, however, the evidence from the entire record could not lead a rational fact-finder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587.

*Legal Discussion*

Presently before the Court is a federal claim against Union Memorial Hospital under EMTALA, as set forth in 42 U.S.C. § 1395dd (West 1992). Specifically, that Union Memorial Hospital violated that Act by failing to provide an adequate screening and by failing to stabilize Mr. Romo's condition prior to his being transferred to Carolina Medical Center (CMC).

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The question here then, is whether there is a

need to try the Plaintiff's EMTALA claims. After a careful review of the record in this matter, the Court finds that resolution of the EMTALA claims require the determination of several largely factual questions, which are, of course, traditionally entrusted to a jury. In the present case, there are several material evidentiary facts which remain in dispute, as well as, witness credibility issues and conflicting evidence which must be weighed by the jury at trial. Furthermore, the Plaintiff has met his burden of demonstrating the existence of a genuine dispute with respect to both aspects of her EMTALA claims.[1]

Plaintiff has presented evidence that Union Memorial Hospital deviated from its standard screening procedure in treating Mr. Romo. Furthermore, Plaintiff has presented evidence which suggests that Romo had an emergency medical condition; the hospital knew of the condition; the patient was not stabilized, as that term is defined, prior to the transfer; and proper consent was never obtained, nor were appropriate certification and transfer procedures allegedly followed prior to the transfer to CMC.

### 1. *Medical Screening Claim*

EMTALA requires that the hospital must provide "an appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a) (West 1992).[2]

Here, like the Plaintiff in *Griffith v. Mt. Carmel Medical Center*, 831 F.Supp. 1532 (D.Kan.1993), plaintiff claims that her husband did not receive an appropriate medical

screening examination as required under § 1395dd(a), on his January 4, 1994 visit to the emergency room at Union Memorial Hospital. Plaintiff alleges that Romo's screening was different than the screening that would have been received by insured patients with similar medical circumstances. As a preliminary matter, Plaintiff asserts that personnel at Union Memorial Hospital, perhaps including Dr. Farquharson, knew that Romo's patient financial classification was "01", indicating self-pay.

Plaintiff also asserts that the evidence reveals more than a misdiagnosis and, in fact, demonstrates differential treatment. Specifically, Plaintiff's allege that the nurses deviated from certain "nursing protocols" which required vital signs be assessed every ten minutes. (*See* Plaintiff's Exhibit D). The Court's review of the medical records indeed indicates that this protocol was not met.

Relying, in part, on *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708 (4th Cir.1993), Defendant's argue that they performed numerous tests and evaluations, and therefore, the medical screening was appropriate within Union Memorial's capabilities. They further assert, by way of affidavit from Dr. Farquharson and RN Pat Broome, that Romo did not receive disparate treatment.

▮▮▮ The Court agrees with Defendant that EMTALA's role is limited,

> to imposing a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition discovered. [*citing Baber v. Hospital Corp. of America*, 977 F.2d 872, 879 (4th Cir.1992); *see also, Gatewood v. Washington Health Care*

---

**1.** The Court observes that Plaintiff's evidence concerning the adequate medical screening requirements imposed by the statute is, at first glance, somewhat scant. Notably, Plaintiff relies solely on Defendant's failure to follow one procedure in a nursing protocol. However, denial of summary judgment is appropriate since the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in her favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

Furthermore, although this is apparently the only significant indicator of differential treatment pre-

sented by the Plaintiff, it is apparently a very significant one. *See infra*, at n. 3.

**2.** The Court notes that plaintiff's have presented significant evidence to support there allegation that the Defendant knew of Romo's emergency medical condition. Specifically, Dr. Farquharson's deposition indicated that a blood pressure of 70/30, a pulse rate of 128, respiration of 44, and a temperature of 103 degrees, and a white count down to approximately 2300 indicate an emergency medical condition. (Plaintiff's Exhibit E, at 107–108).

*Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991) ("[A]n 'appropriate' screening is properly determined not by reference to particular outcomes,. but instead *by reference to a hospital's standard screening procedure.*") (emphasis added)....

*Brooks,* 996 F.2d at 710–711. Here, Defendant cites to several cases which recognize that EMTALA is implicated when there has been disparate treatment between patients with respect to standard screening procedures. The Court further agrees that it ought not simply look at the outcome of the screening. However, the Court would be remiss not to compare this particular screening with other indicia of the standard screening procedures. In doing so, the evidence presented here suggests that the procedure governing the taking and recording of vital signs, part of the nursing protocol which is presumably followed as a matter of routine, was not followed in Mr. Romo's case.

■ Furthermore, even if Defendant attended to Romo and treated him with a variety, or in his words "a battery", of tests and evaluations, it may still fall short of an "appropriate medical screening," if there is evidence that the nature, extent and timing of these actions differs from the standard operating procedures received by other paying patients. *See Power v. Arlington Hosp.,* 800 F.Supp. 1384, 1387, n. 6 (E.D.Va.1992) (noting that the Plaintiff must show that the screening examination she received was not as thorough or careful as that which the Hospital would have offered to any other patient); *see also Jones v. Wake County Hosp. Sys., Inc.,* 786 F.Supp. 538, 544 (E.D.N.C.1991).

■ In any event, such an as yet unexplained omission may constitute a violation of the Act. As noted in *Griffith,* "any departure from standard screening procedures constitutes an inappropriate screening in violation of the Emergency Act." *Griffith,* 831

F.Supp. at 1539, *citing, Gatewood,* 933 F.2d at 1041; *see also, Baber,* 977 F.2d at 881.

In the context of this case, the fact that certain routine procedures and nursing protocols were allegedly not followed suggests disparate treatment and may prove to be evidence of an inappropriate screening under EMTALA. Indisputably, a standard operating procedure represents the method by which all similarly situated persons, as a matter of procedure, should be treated. Defendant has stated in his brief that plaintiff need not prove what the hospital's motives were in providing unequal treatment and the Court agrees that to this juncture they have not presented any weighty evidence on this point. *See Griffith,* 831 F.Supp. at 1540. However, although they have not presented evidence demonstrating why certain procedures were not followed, as noted above, they have presented some evidence which suggests a divergence from the Hospital's standard operating procedures did occur. *See Power,* 800 F.Supp. at 1387, n. 6 (EMTALA claim may be made out through proof of a failure to adhere to the Hospital's standard protocols). Plaintiff correctly points out that failure to record these vital signs is arguably necessary in order for the physician to make the determination of whether an emergency medical condition exists as required under the Act.[3]

As in *Griffith,* Plaintiff will have to prove at trial that the screening provided to her husband was different than the screening Union Memorial would have provided to another patient who had similar symptoms or a similar condition. In any event, there appear to be genuine issues of material fact concerning whether the medical screening provided to Romo was "appropriate" within the meaning of EMTALA. In this case, Plaintiff's allegations of disparate treatment are supported by specific facts which suggest that the screening provided to Romo may not have been as thorough as that given to other

---

3. The Court notes that the import of this information was illustrated by Dr. Farquharson's deposition testimony wherein he relied upon similar "vital" sign information to opine that a patient was in an "emergency medical condition." *See* Plaintiff's Exhibit E at 107–108. The Court also notes that Defendant's rely upon the vital sign information to show that no material deterioration had occurred during the transfer—their reliance further demonstrates the import of this information and enhances Plaintiff's claims that failing to timely record such important information was a significant omission.

similarly situated patients and that it was not in accordance with the Hospital's nursing protocols. At least to some degree, this may also call into question the reasons why the protocols were not followed and why such seemingly large time gaps elapsed between vital sign checks. Accordingly, summary judgment on this aspect of the EMTALA claims is inappropriate.

### 2. *Failure to Stabilize and Improper Transfer Claims*

■ Plaintiff's other § 1395dd claim essentially alleges that the Hospital violated their duty to provide "such treatment as may be required to stabilize the medical condition ... or to transfer the individual to another medical facility in accordance with subsection (c)," 42 U.S.C. § 1395dd(b)(1), which provides that the transfer is prohibited unless the patient or lawful surrogate, fully informed of the risks of transfer, requests or consents to it or a physician certifies that medical benefits from transfer outweigh risks. 42 U.S.C. § 1395dd(c)(1)(A)(i) & (ii). Like the case in *Power,* the record here "bristles with factual disputes on these claims thereby foreclosing summary judgment." *Power,* 800 F.Supp. at 1387, n. 6.

■ Defendant first contends that Romo was "stabilized" as that term is defined under the Act. On this issue, Defendant correctly notes that under EMTALA, a patient's emergency medical condition is "stabilized" if "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from the facility." 42 U.S.C. § 1395dd(e)(3)(B). In support of this position, Defendant refers the Court to the medical records indicating Romo's vital signs before and after the transfer; the testimony of their expert, Dr. Wase; and, Dr. Bower's deposition which indicates that in his best judgment, Romo was stabilized and needed the transfer to CMC. Defendant also contends that, on their face, the medical records show that no material deterioration occurred.

■ Not surprisingly, this point is sharply disputed by Plaintiff's experts. These experts opine that Romo was not stable prior to the transfer; that it was within the hospitals

capabilities to adequately resuscitate Romo prior to transfer; and, that the delay due to the transfer coupled with inadequate resuscitation might have resulted in a material deterioration of his organs. Here again, Plaintiff correctly argues that this divergence in expert testimony crystallizes the factual dispute as to whether a material deterioration of Romo's condition was likely to occur, and this issue must certainly be resolved by the jury. *See Delaney v. Cade,* 986 F.2d 387, 392–93 (10th Cir.1993); *Deberry v. Sherman Hosp. Ass'n,* 741 F.Supp. 1302, 1305 (N.D.Ill.1990). The Court concedes that, looking only to the vital signs before and after the transfer, there are apparently no manifest signs of material deterioration; however, vital . signs are certainly not the only indicators of material deterioration of a patient's condition and Plaintiff's expert's strenuously argue that condition may have deteriorated as a result of the transfer. Whether Romo's condition did or did not deteriorate, or, whether his condition was likely, within reasonable medical probability, to deteriorate or not, is a question to be decided by the jury.

■ Lastly, Defendant argues that even if Romo was not stabilized, the transfer was nonetheless proper under EMTALA. In situations where the emergency medical condition has not been stabilized the statute prohibits a transfer unless (1) the patient or his legal representative consents in writing; (2) the physician signs a certification that the medical benefits of transfer outweigh the risks to the individual; or (3) if the physician is not physically present a qualified medical person signs the certification after a physician in consultation with the person has made the appropriate risk/benefit determination, and the physician subsequently countersigns the certification. *See* 42 U.S.C. § 1395dd(c)(1). The statute also requires that a summary of the risks and benefits be included in the certification. *Id.*

Defendant argues that Dr. Bower had determined that an ICU/CCU bed was required for Romo and such a bed was not "within the staff and facilities available" at the Hospital, and that, in Dr. Bowers best medical judgment, the medical benefits outweighed the risk associated with the transfer to CMC.

Defendant's support this position with the expert testimony of Dr. Wase who opines that the medical chart notation, "[t]his is an acutely ill person. The diagnosis and the fact that we have no ICU beds, I think it is clearly in this patient's best interest," is analogous to a weighing of the risks and benefits. Defendant adds that a form was also prepared which indicates that the necessary risk/benefit analysis was performed. (*See* Defendant's Exhibit G).

The record reveals that Romo's consent was not obtained, that no physician signed a certification as required and that the document which was submitted as evidence of having weighed the risk/benefits factors was similarly not in compliance with the statute. Specifically, that document was not countersigned by a physician and did not contain any summary of the risks and benefits nor a reference to where such analysis might be found. There is little doubt that Union Memorial has failed to comply with the specific "technical" requirements of the statute. The Fourth Circuit has recognized that "a physician *must* certify that the medical benefits to be gained by the transfer outweigh the possible risks of the transfer." *Baber,* 977 F.2d at 883, n. 10 (emphasis added). Accordingly, absent any certification, the Court believes the issue whether a risk/benefit analysis was ever properly made is one which must be decided by the jury.

In sum, given the factual disputes raised by the evidence plaintiff has presented to support her EMTALA claims, summary judgment cannot appropriately be granted on those claims in the present case. There is sufficient evidence from which a jury could legitimately infer that Mr. Romo was not given the same medical screening afforded to other patients in his circumstance and that Union Memorial Hospital, after determining that Mr. Romo had an emergency condition, failed to properly stabilize him and improperly transferred him to CMC.

**NOW, THEREFORE, IT IS ORDERED** that the Defendant's motion for summary judgment be, and hereby is **DENIED.**