William R. SCOTT, Heir at Law, Next of Kin, and Surviving Spouse of Eileen G. Scott, Deceased, Plaintiff,

v.

HUTCHINSON HOSPITAL; Daniel J. Scroggie, M.D.; and Randle C. Johnson, M.D., Defendants.

No. 95–1025–JTM.

United States District Court, D. Kansas.

March 4, 1997.

MARTEN, District Judge.

*MEMORANDUM AND ORDER*

Plaintiff William R. Scott seeks damages for the wrongful death of his wife, Eileen G. Scott, from defendants Hutchinson Hospital (Hutchinson), Daniel J. Scroggie, M.D., and Randle C. Johnson, M.D. Scott asserts jurisdiction under 28 U.S.C. § 1331, alleging the hospital violated the Emergency Medical Treatment and Active Labor Act (EMTALA), enacted as part of the Consolidated Omnibus Budget Reconciliation Act (COBRA), and codified at 42 U.S.C. § 1395dd *et seq.*, thus raising a federal question.

Hutchinson moves for summary judgment, alleging Scott can not establish a violation under EMTALA and no federal question jurisdiction exists over Scott's state law claims.

I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to show that there is

an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

Once the initial showing has been made, the burden shifts to the nonmoving party to designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. When determining whether there is a material issue of fact, the nonmoving party's evidence is to be believed; all justifiable inferences are to be drawn in its favor; and its nonconclusory version of any disputed issue of fact is assumed to be correct. *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Publ., Inc.,* 63 F.3d 1540, 1545 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996).

## II. FACTS

The following summary of facts is based on the factual allegations of the parties where supported by appropriate citations to the record.[1] Where a factual allegation is disputed, all reasonable inferences are drawn in Mr. Scott's favor.

At 8:40 a.m. on January 28, 1993, Eileen Scott was brought to the emergency room (ER) at Hutchinson via ambulance in a "code white" mode. Her vital signs were taken at 8:45 a.m. The ER nurse took a history from Mrs. Scott as having an onset of pain in the right foot that morning. Mrs. Scott denied a history of trauma, but claimed to have fallen twice that morning because of weakness. She also complained of pain in the left lower abdomen and the nurse noted the abdomen was soft. Mrs. Scott was coherent and able to give her medical history.

The ER nurse triaged Mrs. Scott as no-nemergent. The assessment occurred at 8:50 a.m. Dr. Scroggie, the ER physician, testified this category was appropriate for patients with an earache or sprained ankle.

Dr. Scroggie examined Mrs. Scott at 9:09 a.m. and obtained a medical history. Mrs. Scott indicated she was insulin dependent diabetes mellitus-brittle. She said she had been vomiting in the morning for the past two to three weeks. That morning she had vomited some bilious material. She told Dr. Scroggie she had pain in the right foot, left shoulder and left side. Dr. Scroggie found her in no apparent distress. Her abdomen was obese, yet soft with some tenderness in the upper left quadrant. Dr. Scroggie noted in the medical records Mrs. Scott's preexisting diabetes, and symptoms of vomiting and weakness.

Blood work for a screening exam was drawn at 9:14 a.m. The blood work showed: white blood count, 14.1; red blood count, 3.39; hemoglobin 11.1; hematocrit, 34.4; platelets, 614; potassium, 3.3; alkaline phosphorus, 186.

Dr. Scroggie ordered a second set of blood work at 10:06 a.m. He did not have admitting privileges for Hutchinson and Mrs. Scott did not have a local physician. Dr. Scroggie attempted to call Dr. Albright, Mrs. Scott's physician at the Halstead Clinic, but he was unavailable. Dr. Randle Johnson was on call for patients who were without a local physician, and at 10:47 a.m. Dr. Scroggie called Dr. Johnson. Dr. Scroggie did not attempt to send Mrs. Scott away from the hospital. He initially indicated she needed admission.

Dr. Johnson came to the ER and examined Mrs. Scott at 11:05 a.m. Dr. Johnson took a family history of heart-related deaths. He examined Mrs. Scott and found she had quiet bowel sounds and tenderness throughout her abdomen with no rebound. At 11:15 a.m. a relative called the ER and indicated Mrs. Scott's original complaints included arm pain and syncope.

Mrs. Scott had a history of heart problems within the prior two years. She also had a previous history of pain in her shoulder. The parties do not indicate whether Hutchinson or the doctors were made aware of this history.

---

1. Both Hutchinson and Mr. Scott assert additional facts in discussion which they did not list in their statements of undisputed facts, sometimes without citation to the record. This is in violation of D. Kan. Rule 56.1. Nevertheless, where supported by appropriate citations and with all reasonable inferences drawn in Mr. Scott's favor, such facts have been considered by the court because both parties failed to comply with the rule and no purpose would be served by ignoring these facts.

At 11:25 a.m., Mrs. Scott was hooked up to a heart monitor. At 11:32 a.m., an EKG showed a sinus tachycardia with occasional premature ectopic complexes and ST elevation. EKG's taken at 11:32 a.m. and 12:35 p.m. were reported as abnormal and suggested an acute infarct. Dr. Johnson diagnosed Mrs. Scott as having a myocardial infarction and ordered her transferred to the ICU of Hutchinson. Dr. Johnson ordered routine coronary care and further studies through Monday, February 1, 1993.

Mrs. Scott was taken to ICU at approximately 12:07 p.m.[2] The ICU nurse noted Mrs. Scott complained of nausea with lower left quadrant abdominal pain. Her skin was warm, dry and pale. Her abdomen was rounded, very soft with very hyperactive bowel sounds. Mrs. Scott told the nurse her rounded abdomen was normal and she had not had a bowel movement for two days, which was normal. Mrs. Scott's left foot was bruised and appeared to be swollen from the fall reported that morning. Mrs. Scott's estimated length of stay was five to eight days.

Dr. Johnson ruled out contraindications of thrombolytic therapy due to bleeding based on the initial history. A CT scan and a sonogram are two tests that can be employed to rule out active bleeding or an aneurysm. Dr. Johnson did not perform these tests before ordering thrombolytic therapy.

Dr. Johnson prescribed Eminase (thrombolytic therapy) to counteract the MI. Dr. Johnson did not inform the family of the risk/benefit ratios of the treatment or other treatment options available. Dr. Johnson indicated the shot would eat up blood clots and if it was his mother, he would give her the shot. He believed thrombolytic therapy was the only alternative other than conservative care. The Eminase had an immediate positive effect on Mrs. Scott's chest pain and blood pressure.

There was no cardiologist available in Hutchinson. Dr. Johnson would have turned Mrs. Scott's care over to a cardiologist had one been available.

At 1:06, 1:09, and 1:15 p.m. Mrs. Scott's blood pressure was recorded as 76/palpable. At 1:33 p.m., Mrs. Scott complained it was hard to breathe. She was more lethargic and her skin was cool and dry. At 1:35 p.m., Mrs. Scott's blood pressure was recorded as 64/Doppler. Dr. Johnson was called and informed of her condition.

A chest X-ray was taken and revealed the presence of cardiomegaly, lefty costophrenic angle atelectatic areas. Mrs. Scott's blood pressure dropped to 40/Doppler between 1:46 and 1:59 p.m. Dr. Johnson ordered IV fluids and Dopamine. Mrs. Scott's blood pressure returned to approximately 74/Doppler at 2:17 and 2:20 p.m.

Dr. Johnson informed the family that Mrs. Scott needed to be transferred to Wesley Medical Center. He said Mrs. Scott needed a balloon angioplasty, which could only be performed in Wichita. Paul A. Bishop[3] signed a release form for the transfer of medical records to Wesley Medical Center, specifically for medical care.

Dr. Johnson testified Mrs. Scott orally consented to the transfer to Wesley after the family declined to authorize a transfer. The family was notified Mrs. Scott would be transferred to Wesley as soon as she was stable and the family did not object. There is no testimony that the family approved or objected to the transfer. There is no written documentation that a transfer was approved by Mrs. Scott or the family. The family believed Mrs. Scott should have been transferred to Wesley Medical Center earlier in the day.

The Reno County Ambulance Service was notified at 2:29 p.m. of a transfer to Wichita. The ambulance arrived at the ICU at 2:35 p.m., where the attendants received a report on Mrs. Scott. Mrs. Scott's blood pressure at 2:35 p.m. was 66/Doppler. Mrs. Scott was released from the ICU for transfer at 2:39 p.m.

Hutchinson nursing staff completed an "Inter-Institutional Patient Transfer Sheet"

2. At one point the parties agree Mrs. Scott was transferred to ICU at 12:07 p.m. and at another point 2:07 p.m. The medical records indicate the correct time was 12:07 p.m.

3. The pleadings are confusing regarding Bishop's relationship to Mrs. Scott. It is not necessary to resolve this question.

on Mrs. Scott for the transfer to Wesley Medical Center. The transfer sheet indicates Mrs. Scott's condition at the time of transfer was critical and her diagnosis was "cardiac other." Dr. Johnson testified her condition at the time of transfer was critical and unstable. EMS personnel recorded her condition on transfer as alive and unstable.

Mr. Scott asserts the correct form is a "Patient Transfer to Another Facility" form. This form contains a physician's certificate that the risks and benefits of the treatment at another facility outweigh the risks from the transfer. It also contains a signature blank for consent to transfer. An ICU nurse testified the "Patient Transfer to Another Facility" form was not used for transferring a patient from ICU to another facility. It appears the form was used for transfers from the ER to another facility.

Dr. Johnson rode in the ambulance with Mrs. Scott during the transfer. Her blood pressure was recorded twice during the transfer. It was 70/palp at 2:50 p.m. and 78/palp at 3:20 p.m. She was given oxygen, IV fluids and Dopamine while en route to Wesley. EMS personnel noted Mrs. Scott tolerated the transfer well. Mrs. Scott's condition did not change appreciably during the transfer. A nurse testified Mrs. Scott's condition was stable at the time of transfer.

Mrs. Scott arrived at Wesley at 3:29 p.m. EMS personnel recorded her condition as alive and unstable. Her diagnosis on admission to Wesley was acute myocardial infarction. Mrs. Scott was taken to Coronary Care Unit 308 and released into Wesley's care. The nurses at Wesley were given a full report on her condition.

At Wesley, Dr. Mark Bowles examined and treated Mrs. Scott. He concluded an ultrasound showed Mrs. Scott had a large amount of free fluid in the belly consistent with intra-abdominal bleeding. At this point he noted her abdomen started distending. The doctors at Wesley diagnosed intra-abdominal bleeding after running tests on Mrs. Scott's abdomen.

Dr. Jayce Hyder ruled out surgery to correct the bleeding. Dr. Hyder concluded the likelihood of successful surgery was less than 1% unless a more stable cardiovascular status could be established.

Mrs. Scott was pronounced dead at approximately 6:00 p.m. on January 28, 1993. The cause of death was listed as: (1) massive intra-abdominal bleeding related to thrombolytic therapy; (2) inferior wall myocardial infarction with good electro-cardiographical and clinical response to thrombolytic therapy; and (3) history of left lower quadrant abdominal discomfort. Dr. Bowles' principal diagnosis on the Wesley discharge summary is listed as inferior wall myocardial infarction, thrombolytic therapy, and massive intra-abdominal hemorrhage, etiology obscure. He noted on the discharge summary that he examined Mrs. Scott for possible ruptured aortic aneurysm and proximal aorta in the mid abdominal region.

The family declined to have an autopsy performed to determine the exact cause of death. Neither Dr. Scroggie nor Dr. Johnson diagnosed an abdominal aortic aneurysm in their evaluations of Mrs. Scott.

Dr. Johnson's expert cardiologist, Dr. Richard Steckley, testified that if he was presented with a patient and he was considering acute myocardial infarction, he would order an electrocardiogram and cardiac enzyme tests to initiate the screening process for the problem.

In January 1993, Hutchinson did not have the ability to provide necessary medical care to an MI patient with medical problems such as Mrs. Scott. Hutchinson did not have a cardiac catheterization lab.

Hutchinson filed a motion to dismiss, asserting Mr. Scott failed to state a claim under EMTALA, but withdrew the motion before the court could render a decision. Mr. Scott's second and third causes of action allege violations of EMTALA. Mr. Scott's other claims are based on Kansas law. As noted at the outset, Hutchinson now seeks summary judgment on plaintiff's EMTALA claims and dismissal of the state claims.

### III. ANALYSIS

The relevant COBRA provisions, 42 U.S.C. § 1395dd(a), (b), and (c), read as follows:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any in-

dividual ... comes to the emergency department ... the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, ... to determine whether or not an emergency medical condition ... exists,

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) In general

If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . . .

(3) Refusal to consent to transfer

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) of this section and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

. . . .

(c) Restricting transfers until individual stabilized

(1) Rule

If an individual at a hospital has an emergency medical condition which has not been stabilized ... the hospital may not transfer the individual unless—

(A) (i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

(ii) a physician ... has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual ... or

(iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer—

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health. . . .

. . . .

(d) Enforcement

. . . .

(2) Civil enforcement

(A) Personal harm

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

. . . .

(e) Definitions

(3) (B)

The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, ...

. . . .

(f) Preemption

The provisions of this section do not preempt any State or local requirement, except to the extent the requirement directly conflicts with a requirement of this section.

A claim may be brought against a hospital under EMTALA for failing to conduct an appropriate medical screening (S 1395dd(a)), failing to further examine and treat a person whom the hospital has determined has an emergency medical condition (S 1395dd(b)(1)(A)), improperly discharging such a person prior to stabilization (S 1395dd(b)(1)), or improperly transferring such a person prior to stabilization (S § 1395dd(b)(1)(B) & 1395dd(c)). *Collins v. DePaul Hospital,* 963 F.2d 303, 305–06 (10th Cir.1992).

■ EMTALA is neither a federal malpractice nor a negligence statute. Rather, the purposes of EMTALA are to ensure that each patient is accorded the same level of treatment and to prohibit dumping of unstabilized patients. *Repp v. Anadarko Mun. Hospital,* 43 F.3d 519, 522 (10th Cir.1994); *Tank v. Chronister,* 941 F.Supp. 969, 972 (D.Kan.1996). "Patient dumping" refers to the practice of transferring or refusing to treat a patient for economic reasons. However, a plaintiff need not show the hospital's motive was to dump a patient in order to recover under EMTALA. *Collins,* 963 F.2d at 308.

Scott alleges Hutchinson failed to conduct an appropriate screening, failed to properly examine and treat Mrs. Scott, and improperly transferred Mrs. Scott prior to stabilization. Scott does not raise a claim of improper discharge.

**A.** *Appropriate Screening Under Section 1395dd(a)*

■ Scott's claim that the hospital failed to conduct a proper initial screening is based upon Hutchinson's failure to initially discover Mrs. Scott's cardiac condition and internal bleeding condition. Scott argues that given Mrs. Scott's initial symptoms she should have been screened for cardiac conditions and abdominal bleeding instead of triaged as nonemergent. Scott notes that more than two hours passed before Mrs. Scott was screened for cardiac conditions and that she was never screened for abdominal bleeding. Hutchinson argues Scott's claim fails because he did not cite evidence that Hutchinson had not complied with its own screening procedures.

Hutchinson is correct. A hospital satisfies the requirements of § 1395dd(a) if its standard screening procedure is applied uniformly to all patients in similar medical circumstances. *Repp,* 43 F.3d at 522. In the absence of evidence that the hospital failed to follow its standard screening procedure, Hutchinson is entitled to summary judgment on Scott's improper screening claim.

Scott next argues Dr. Steckley's testimony establishes that the screening procedure was inadequate. There are two problems with this argument. First, Dr. Steckley does not address Hutchinson's standard screening procedures. Second, when testifying regarding what he considered to be appropriate screening procedures, Dr. Steckley assumes Hutchinson was presented with a patient and suspected cardiac problems. There is no evidence Hutchinson suspected cardiac problems when Mrs. Scott was initially presented for treatment. There is evidence that once Dr. Johnson suspected cardiac problems, appropriate screening and treatment procedures were initiated. Dr. Steckley's testimony does not save Scott's claim. Hutchinson is granted summary judgment on Scott's claim under § 1395dd(a).

**B.** *Appropriate Treatment Under Section 1395dd(b)(1)(A)*

■ Scott argues Hutchinson failed to properly examine and treat Mrs. Scott for her cardiac problems and the aneurism. A hospital's duty to provide appropriate treat-

ment arises once the hospital determines that an emergency condition exists. *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1140 (8th Cir.1996) (en banc). *See also Urban By and Through Urban v. King*, 43 F.3d 523, 526 (10th Cir.1994) (applying the § 1395dd(b) requirement of actual knowledge of an emergency condition to § 1395dd(c)). Hutchinson determined Mrs. Scott had an emergency cardiac condition and began treatment designed to stabilize that condition. Because Hutchinson never determined that Mrs. Scott had an aneurism, no duty to provide treatment for that condition arose.

The reasoning of *Repp* applies to claims for treatment as well as screening claims. Accordingly, Scott must show Hutchinson provided treatment to Mrs. Scott that deviated from the standard practice of the facility for patients with similar known medical conditions. Scott has not cited any evidence that Hutchinson did not follow its standard practices for treating patients with similar cardiac conditions. In fact, Dr. Johnson's testimony indicates he would have recommended the same treatment course for his own mother.

Accordingly, Hutchinson is granted summary judgment on Scott's claim that Hutchinson failed to properly examine and treat Mrs. Scott once it had determined an emergency condition existed.

### C. *Transfer*

Scott argues Hutchinson improperly transferred Mrs. Scott prior to stabilizing her condition. Scott alleges Hutchinson failed to obtain written consent to the transfer or certification from a doctor that the risks associated with the transfer were outweighed by the potential benefits, as required by § 1395dd(c)(1). In addition, Scott argues the transfer was not an appropriate transfer under § 1395dd(c)(2) because the hospital failed to provide medical treatment within its capacity to minimize the risks to Mrs. Scott's health from the cardiac condition and the aneurism.

■ Hutchinson asserts under a number of theories that it cannot be held liable under § 1395dd(c).[4] Hutchinson argues it cannot be liable under § 1395dd(c) because it was not aware Mrs. Scott was experiencing abdominal bleeding. *Urban* held a hospital must have actual knowledge of the patient's emergency medical condition in order to be held liable under § 1395dd(c) for discharging or transferring an unstabilized patient. *Urban*, 43 F.3d at 527. Hutchinson argues the specific medical condition must be known to the hospital.

It is clear from the statute and the language of *Urban* that the determination by the hospital that a patient has "an emergency medical condition" is sufficient. *Urban*, 43 F.3d at 526. In any event, the evidence supports a conclusion that Mrs. Scott had two emergency circumstances—a cardiac condition and bleeding—and Hutchinson was aware of the cardiac condition. Scott's claim under § 1395dd(c)(1) is not barred because Hutchinson lacked actual knowledge of Mrs. Scott's bleeding condition, particularly where it had actual knowledge of her cardiac condition.[5]

■ However, the reasoning of *Repp* applies with regard to the treatment provided to minimize the risks associated with the transfer. Section 1395dd(c)(2) does not require a hospital to minimize risks associated with a condition until it is aware the condition exists. Hutchinson provided treatment designed to stabilize the cardiac condition and symptoms of which it was aware. It was not required to provide treatment designed to stabilize the bleeding condition of which it was unaware. Hutchinson is entitled to summary judgment on Scott's claim that the transfer was not an appropriate one under § 1395dd(c)(2).

Hutchinson next argues Mrs. Scottes condition was stable; thus, the hospital was not required to comply with the transfer provisions of § 1395dd(c). Hutchinson relies on the testimony of a nurse that Mrs. Scott's

---

4. Hutchinson's reply brief can be read as asserting an additional ground for summary judgment—Scott's failure to show violations of EMTALA caused Mrs. Scott's death. Hutchinson did not raise this argument in its motion for *summary* judgment and the court will not consider it.

5. In fact, Hutchinson argues the bleeding condition was secondary to the cardiac condition.

condition was stable at the time of the transfer and readings taken by EMS personnel during the transfer. However, Scott cites Dr. Johnson's testimony that Mrs. Scott was unstable at the time of the transfer. The EMS personnel classified Mrs. Scott as unstable. Furthermore, Dr. Johnson felt it was necessary for him to travel in the ambulance during the transfer. He provided treatment during the transfer designed to stabilize Mrs. Scott's condition. This is sufficient evidence from which a reasonable juror could conclude Mrs. Scott's condition was likely to deteriorate during the transfer. *See Delaney v. Cade*, 986 F.2d 387, 392–93 (10th Cir.1993) (where state of the evidence puts into question whether at the time of transfer "no material deterioration" was likely within a reasonable medical probability, a material question of fact is raised); *Romo v. Union Memorial Hosp., Inc.*, 878 F.Supp. 837, 843 (W.D.N.C.1995) (conflicting evidence regarding patient's stability precluded summary judgment).

Hutchinson next argues it complied with the requirements of § 1395dd(c)(1). Compliance would require either written consent to the transfer or certification by a physician that the anticipated benefits of the transfer outweigh the risks associated with the transfer.

Hutchinson claims Mrs. Scott orally consented to the transfer and this evidence is undisputed. The hospital acknowledges the statute requires consent to be in writing, but argues the purpose of the statute is to avoid arguments as to whether or not there was consent. With regard to certification, Hutchinson argues Dr. Johnson actually weighed the risks and benefits associated with the transfer. According to Hutchinson, where there is no dispute as to actual consent and Dr. Johnson actually weighed the risks and benefits before deciding to transfer Mrs. Scott, the statute's purpose is satisfied and substantial compliance with the statute has occurred.

*Romo* held that the absence of written consent or certification raised a material question of fact precluding *summary* judg-

ment for the defendants. 878 F.Supp. at 844. Where the statute clearly contemplates written documentation, and here, plaintiff Scott denied consent, the court agrees with *Romo* that a material question of fact exists with regard to compliance.[6]

Finally, Hutchinson argues that once Mrs. Scott was admitted to the ICU, EMTALA no longer applied. Hutchinson cites no case law in support of this proposition. The court's own research has not disclosed a case squarely addressing the scope of EMTALA. The court recognizes there are cases which implicitly must hold EMTALA reaches beyond the emergency room. *See, e.g., Urban, supra; Vargas, supra.* Nevertheless, following a careful review of the statute, the purposes of the statute and existing case law, the court concludes that once a patient has been screened properly in an emergency room under 42 U.S.C. § 1395dd(a), admitted to the hospital for treatment, and is receiving treatment, the transfer provisions of 42 U.S.C. § 1395dd(c) do not apply. In the present case, where Mrs. Scott had been admitted to the Intensive Care Unit of Hutchinson Hospital and was receiving treatment, her transfer to Wesley Medical Center in Wichita was not subject to 42 U.S.C. § 1395dd(c).

The Fourth, Ninth, and Tenth Circuits have addressed, at least implicitly, the circumstances under which § 1395dd(c) imposes liability on a hospital. Perhaps the case most directly on point is *Bryan v. Rectors and Visitors of Univ. of Virginia*, 95 F.3d 349 (4th Cir.1996).

In *Bryan*, the patient was admitted to the hospital for treatment and her condition stabilized. The family directed the hospital to continue efforts to keep the patient alive. Contrary to the family's directions, the hospital entered a "do not resuscitate" order. Eight days later the patient became unstable, her condition was not stabilized and she died. The Fourth Circuit held § 1395dd(b)'s requirement that a hospital stabilize or transfer a patient did not apply once the patient was admitted for long-term care and the hospital was no longer considering whether

---

**6.** The fact finder may still decline to impose liability based on a finding of substantial compliance. *See Vargas by and Through Gallardo v. Del*

*Puerto Hosp.*, 98 F.3d 1202 (9th Cir.1996) (affirming the trial court's finding of substantial compliance).

to treat or transfer the patient but had assumed the obligation of providing treatment.

*Bryan* reasoned that the purpose of EMTALA was to prevent patient dumping. The court found that the statute requires a hospital presented with an emergency patient to provide immediate stabilizing treatment with appropriate follow-up. *Bryan* reasoned the duty to stabilize or transfer must be cut off at some point or a hospital could be required to provide stabilizing treatment indefinitely, perhaps for years. The court found it appropriate to terminate liability under EMTALA after the establishment of a physician-patient relationship and the attachment of liability under state tort law, citing EMTALA's provisions limiting the preemption of state tort law. It found the hospital had assumed the responsibility for treating the patient and state tort law could provide an appropriate remedy. Thus EMTALA no longer applied. *Bryan*, 95 F.3d at 350–352 (affirming dismissal for failure to state a claim).

The Ninth Circuit has expressed conflicting views on when liability exists under § 1395dd(c). The Ninth Circuit first appears to have addressed the issue in *James v. Sunrise Hospital*, 86 F.3d 885 (9th Cir.1996). James was admitted to the hospital and treated for acute renal failure. The hospital inserted a synthetic graft into her arm. James complained of pain in her arm and it began to turn blue. A nurse noted her pulse was weak in the arm. Nevertheless, James was discharged without any evaluation of the condition of her arm. Subsequently, her hand was amputated. James asserted a claim only under the provisions of § 1395dd(c) and did not allege the hospital was aware that an emergency condition existed when she was discharged.

The Ninth Circuit held that § 1395dd(c) did not apply because (1) James was not in the emergency room, and (2) the hospital had not determined an emergency situation existed. The court acknowledged the question was close and the statute could reasonably be construed differently.

The Ninth Circuit again touched on the issue in *Vargas, supra*. Vargas was having seizures and was admitted to the hospital for treatment. After providing treatment for several hours, the treating physician determined the hospital lacked the facilities to properly treat Vargas and the benefits of treatment at another facility outweighed the risks associated with transfer. The physician certified the transfer was necessary, but failed to list the benefits and risks considered as required by § 1395dd(c)(1). Implicitly assuming EMTALA applied, the Ninth Circuit affirmed the trial court's finding that no violation occurred where the physician actually weighed the risks and benefits of the transfer.

The Tenth Circuit has suggested it would not adopt *James'* holding that § 1395dd(c) applies only to transfers and discharges from emergency rooms. *See Urban*, 43 F.3d at 523, 526. Urban was pregnant with twins in a high risk pregnancy. She went to the hospital for a scheduled stress test. The test was nonreactive, meaning there was no fetal movement. However, fetal heart tones were in the 150s for each infant and Mrs. Urban's vital signs were normal. Mrs. Urban was sent home with instructions to return the next day for another stress test. She was not told the results of the test. When she returned the next day hospital personnel realized something was seriously wrong. An emergency c-section was performed. One twin was stillborn and the other was born with brain damage.

Urban brought a claim under § 1395dd(c) alleging she was improperly discharged after the first stress test. The Tenth Circuit held Urban need not assert a claim under § 1395dd(a), the emergency room screening requirement, in order to assert a claim under § 1395dd(c). However, *Urban* held the sections must be interpreted together. It read into § 1395dd(c) the requirement of § 1395dd(b) that the hospital have actual knowledge of the emergency medical condition before liability attaches. The Tenth Circuit affirmed summary judgment because Urban failed to present evidence that the hospital had actual knowledge of the emergency condition when it discharged her after the first stress test.

The court finds the Fourth Circuit's reasoning in *Bryan* persuasive and applicable to the facts of this case.[7] Hutchinson assumed

---

7. The court acknowledges *Bryan* involved EMTA-LA's stabilization requirements under

responsibility for Mrs. Scott's treatment under state tort law when she was admitted to ICU and the hospital began treating her condition. Hutchinson was no longer weighing whether to assume responsibility for Mrs. Scott's treatment or to stabilize and transfer her to another facility. At this point, Hutchinson met its responsibilities under EMTALA and assumed liability for negligent treatment under state tort law. When Dr. Johnson subsequently determined the facilities at Hutchinson were inadequate and Mrs. Scott should be transferred to Wesley, EMTALA no longer applied.

To hold otherwise would not allow a hospital to transfer a patient of weeks' or months' duration who develops an "emergency medical condition" to another hospital better equipped to treat the condition without complying with EMTALA's transfer requirements. Such a result is potentially inconsistent with the patient's need for prompt care and with EMTALA's concern that patients receive prompt skilled care.

Finally, the court, in reading the statute as a whole, notes 42 U.S.C. § 1395dd(c)(1)(A)(iii) refers specifically to a situation wherein "a physician *is not physically present in the emergency department* at the time an individual is transferred" (emphasis added), which is a further indication EMTALA was directed to situations in which a patient had not been admitted to a health care facility for treatment. Congress did not have to specify the "emergency department" in this provision.

The court does not consider *Bryan* to be inconsistent with the Tenth Circuit's implied holding in *Urban* that an emergency condition need not originally be presented in an emergency room for EMTALA to apply. For example, if a patient was at a hospital for scheduled outpatient testing and an emergency condition was discovered, the transfer provisions of § 1395dd(c) would apply until the hospital assumed responsibility for treating the discovered emergency condition. Once the hospital assumed responsibility for treating the patient, liability under

§ 1395dd(b). Nevertheless, the reasoning of *Bryan* applies to the transfer requirements of

state tort law would attach and EMTALA would no longer apply.

IT IS ACCORDINGLY ORDERED this 4th day of March, 1997, that defendant Hutchinson Hospital's motion for summary judgment on plaintiff's EMTALA claims (Dkt. No. 113) is granted. Plaintiff's remaining state law claims are dismissed without prejudice.