2001–NMCA–033

25 P.3d 273

**Melvin GODWIN and Connie Godwin, Plaintiffs–Appellants/Cross–Appellees,**

v.

**MEMORIAL MEDICAL CENTER, Defendant–Appellee/Cross–Appellant.**

**Nos. 20,175, 20,189.**

Court of Appeals of New Mexico.

April 5, 2001.

Certiorari Granted, No. 26,919, June 4, 2001.

Victor F. Poulos, The Law Office of Victor F. Poulos, P.C., John J. Grost, El Paso, TX, Shannon L. Donahue, Shannon L. Donahue, P.C., Albuquerque, NM, for Appellants.

Thomas A. Sandenaw, Jr., Leonard J. Piazza, Sandenaw, Carrillo & Piazza, P.C., Las Cruces, NM, for Appellee.

*OPINION*

SUTIN, Judge.

{1} We are asked to address first impression issues regarding the applicability of our New Mexico Tort Claims Act (Tort Claims Act) in an action for damages under the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (1994) (Emergency Act or EMTALA). The Emergency Act proscribes what is commonly referred to as "dumping" of emergency room patients by hospitals.

{2} On motions for summary judgment, the district court held that the Tort Claims Act notice-of-claim and damages-cap provisions were applicable to the Emergency Act claim. However, the court determined that genuine issues of material fact existed regarding the notice-of-claim bar and liability

under the Emergency Act. The issues are before us on interlocutory appeal. We hold (1) the Tort Claims Act's notice-of-claim requirement is preempted by the Emergency Act, (2) the Tort Claims Act limits the damages available under the Emergency Act by placing a "cap" on damages recoverable under the act from a public hospital, and (3) Plaintiffs' proof of the existence of a standard screening procedure for a person presenting a medical condition and of a deviation from that standard screening procedure with respect to that person is a prima facie showing of inappropriate medical screening under the Emergency Act.

**THE PARTIES**

{3} This appeal involves the claims of Melvin Godwin against Memorial Medical Center alleging inappropriate medical screening and wrongful discharge from the Memorial emergency room by an emergency room physician, Dr. Martin Boyd, in violation of the Emergency Act. At the time suit was filed, Memorial was subject to the requirements of the Emergency Act because it received federal funding from Medicare. *See* §§ 1395dd(e)(2) and 1395cc. Memorial was also a government entity as defined in the New Mexico Tort Claims Act. *See* NMSA 1978, §§ 41–4–3(B), (C), and (H) (1995) and – 4(A) and (B) (1996).

{4} Dr. Boyd was not an employee of Memorial. He was an employee of Emergency Health Services Associates of New Mexico (Health Services), an independent entity under contract with Memorial to provide physicians to staff Memorial's emergency room. Dr. Boyd's employment status is a significant factor in deciding issues involving the applicability of the Tort Claims Act to Godwin's Emergency Act claims. Because Dr. Boyd was an employee of Health Services, and not Memorial, Memorial is immune from liability under the Tort Claims Act. *See* §§ 41–4–4(D)(1) and (F); *see also Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 402 n. 14, 827 P.2d 102, 117 n. 14 (1992) (holding that the Legislature retained immunity of state entities and local public bodies for the tortious acts of independent contractors committed within the scope of their duties); *Armijo v. Dep't of Health & Env't*, 108 N.M. 616, 619,

775 P.2d 1333, 1336 (Ct.App.1989). Yet Memorial is sued under the Emergency Act, and therein lies the primary legal conflict in this appeal.

{5} Both Dr. Boyd and Health Services were sued by Godwin for medical negligence, but neither Dr. Boyd nor Health Services nor the medical negligence claims are involved in this appeal.

## BACKGROUND

### I. The Facts

{6} On August 15, 1994, Godwin fell against a church pew causing pain in his back, and he went to Memorial's emergency room where he was examined, evaluated, and discharged by Dr. Boyd. Godwin did not have health insurance.

{7} Still suffering from back pain on August 23, 1994, Godwin returned to Memorial's emergency room where a triage nurse noted his complaints and took his vital signs. A second nurse then became the primary nurse in charge of his case, assisted by a third. Dr. Boyd testified that upon initial examination Godwin complained of diffuse neck and back pain and, upon his orders, nurses injected Godwin with an anti-pain medication.

{8} At some point, Godwin complained to Dr. Boyd about leg weakness and numbness. Godwin testified that he told Dr. Boyd that his back was "killing" him, that his legs were getting weak, that his legs were numb, and that Dr. Boyd knew his feet and legs were numb. Dr. Boyd testified that, at the time he was first preparing to discharge Godwin, Godwin said he was having trouble moving his leg. As a result, Dr. Boyd reevaluated Godwin and ordered a CT scan of his lumbosacral spine. Dr. Boyd had eliminated the neck as a cause of the weakness based on prior negative cervical spine x-rays and the fact that weakness was limited to one leg.

{9} Though the CT scan was negative, Dr. Boyd remained concerned because Godwin's clinical symptoms had not abated and he "didn't know what was going on." Dr. Boyd discharged Godwin, with diagnoses of "weakness to right leg, etiology unclear," and "back pain, musculoskeletal." He wrote instructions for Godwin: "Ibuprofen, as prescribed; neurology appointment ASAP; local heat, four times a day; return if further problem."

{10} The discharge nurse testified she gave Godwin follow-up instructions related to low back pain and a direction to make an appointment with a neurologist. Godwin testified that after the nurse was gone, he spoke only with Dr. Boyd, who, "after everything was said and done and over with . . . walked by the door of the examining room and said, 'you need to see a neurologist ASAP.'" Further, Godwin testified that Dr. Boyd did not talk to him about what the instructions entailed but said he was changing Godwin's pain medication and that he should "go home and stay in bed a couple of days and if it didn't get better, to come back."

{11} Godwin left the emergency room in a wheelchair. According to Godwin, he was unable to move his legs. Godwin assumed that his leg condition resulted from the pain shots and would subside. He testified he "didn't know what a neurologist was" and that he did not think that seeing a neurologist was important.

{12} Two days later, on August 25, 1994, Godwin again returned to Memorial, complaining of back pain and numbness in his legs. An MRI of his thoracic spine revealed compression of his spinal cord by a subdural hematoma, which was removed during an operation at a hospital in El Paso, Texas. Godwin now suffers from permanent paralysis of his lower extremities. Mr. and Mrs. Godwin gave their notice of claim against Memorial by certified letter dated December 20, 1994.

{13} In April 1996, the Godwins filed a complaint for medical negligence against Dr. Boyd and Health Services. In August 1996, the Godwins amended their complaint to add Memorial as a defendant and to seek damages against Memorial based on theories of agency and violation of the Emergency Act.

{14} In April 1998, the court dismissed Mrs. Godwin's "common law hospital claim" against Memorial, expressly finding that "she did not provide timely notice of a tort claim within 90 days of the occurrence, as required by" NMSA 1978, § 41–4–16 (1977) of the Tort Claims Act. The court also found that

the Emergency Act "does not preempt the application of New Mexico's statutory notice period to civil claims brought pursuant to [§ ] 1395dd."

{15} In July 1998, the Godwins filed a second amended complaint adding a respondeat superior-vicarious liability claim against Memorial. The court ruled that its previous order dismissing certain claims of Mrs. Godwin applied to the claims in her second amended complaint. The vicarious liability claims against Memorial were later dismissed leaving, against Memorial, only Mr. Godwin's Emergency Act claim.

{16} Memorial asserted that Godwin's Emergency Act claim was subject to the 90–day notice-of-claim requirement and the damages cap in the Tort Claims Act. Godwin sought summary judgment in his favor on the ground that because Dr. Boyd was not a public employee, and Memorial was thereby immune from liability under the Tort Claims Act, the Tort Claims Act was completely inapplicable. Memorial filed motions for summary judgment on the grounds that Godwin could not overcome his failure to file a timely Tort Claims Act notice of claim, and that even were Godwin to do so, he could not as a matter of law prove a violation of the Emergency Act. The district court denied the motions, leaving to be tried the issues whether Godwin satisfied the Tort Claims Act notice-of-claim requirement and, if so, whether Memorial violated the Emergency Act.

## II. The Emergency Act

### A. Purpose

■ {17} The Emergency Act was enacted to prevent hospitals from refusing to treat patients who do not have health insurance or are otherwise unable to pay for services. *See Draper v. Chiapuzio,* 9 F.3d 1391, 1393 (9th Cir.1993); *Delaney v. Cade,* 986 F.2d 387, 391 n. 5 (10th Cir.1993). Its anti-dumping thrust was "to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community . . . that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.' " *Baber v.*

*Hosp. Corp. of Am.,* 977 F.2d 872, 880 (4th Cir.1992) (quoting 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger)).

■ {18} The Emergency Act creates "a new, federal cause of action" involving " 'resolution of a substantial question of federal law' " and "creat[ing] liability for a refusal to treat, which state malpractice law does not." *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1133 (6th Cir.1990) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)).

■ {19} "[E]nacted to fill a lacuna in traditional state tort law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all," the Emergency Act expresses Congress's intent "to supplement, but not supplant, state tort law." *Hardy v. New York City Health & Hosps. Corp.,* 164 F.3d 789, 792–93 (2d Cir.1999). It incorporates neither a negligence nor a medical malpractice standard in determining liability, *see Baber,* 977 F.2d at 880. Courts have stated that this Act imposes a strict liability on a hospital which violates its requirements. *See, e.g., Repp v. Anadarko Mun. Hosp.,* 43 F.3d 519, 522 n. 5 (10th Cir.1994) (quoting *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 681 (10th Cir.1991)). The Emergency Act "is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir.1994).

### B. Application

{20} The Emergency Act applies to all hospitals receiving federal funding from Medicare which operate an emergency care department. *See* §§ 1395dd(e)(2) and 1395cc. Section 1395dd(a) of the Emergency Act requires hospitals with emergency departments to provide an "appropriate medical screening examination within the capability of the hospital's emergency department" to any individual who comes to the emergency department and requests examination or treatment of a medical condition. Sections

1395dd(b)(1)(A) and (B) require the hospital, within its available staff and facilities, with respect to any individual determined to have an emergency medical condition, to provide for "such further medical examination and such treatment as may be required to stabilize the medical condition" or "for transfer of the individual to another medical facility." "Transfer" includes discharge. § 1395dd(e)(4).

{21} The Emergency Act's right of action permits recovery in damages due to inappropriate screening (§ 1395dd(a)) or failure to stabilize an emergency condition before transfer or discharge (§ 1395dd(b)(1)(A) and (B)). *See* § 1395dd(d)(2)(A). An injured party is entitled to "obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." *Id.* The Emergency Act contains a limitations-on-actions clause: "No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought." § 1395dd(d)(2)(C). The Emergency Act also contains a preemption clause. *See* § 1395dd(f).

### III. Issues Certified to This Court

{22} The district court certified the following issues to this Court for interlocutory review:

1. Does the Tort Claims Act (NMSA 1978, § 41–4–1 to § 41–4–29 (1976, as amended through 1999)), in particular its notice-of-claim and damages-cap provisions, apply to this Emergency Act action? And whether, if the notice-of-claim provision applies, a fact issue exists on either incapacity or estoppel sufficient to withstand an adverse summary judgment on this issue.

2. Does Godwin's claim of inappropriate screening under Emergency Act § 1395dd(a) require a showing of disparate treatment and, if so, did Godwin submit sufficient facts to withstand an adverse summary judgment on this issue?

3. Does Godwin's claim of discharge without proper stabilization of his emergency condition under Emergency Act § 1395dd(b) require a showing of actual knowledge by Memorial of the condition and, if so, did Godwin submit sufficient facts to withstand an adverse summary judgment on this issue?

## DISCUSSION

### I. Standard of Review

■ {23} We review de novo the applicability of the Tort Claims Act. *See In re Estate of Armijo*, 2000–NMCA–008, ¶ 5, 128 N.M. 565, 995 P.2d 487 (holding that construction of a statute is a matter of law). Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See Powell v. New Mexico Highway & Transp. Dep't*, 117 N.M. 415, 417, 872 P.2d 388, 390 (Ct.App.1994).

### II. Applicability of the Tort Claims Act

{24} The issues certified to us by the district court cannot be adequately addressed without our first looking at the general applicability of the Tort Claims Act. We must keep our eyes on the language in the Emergency Act creating the private cause of action. Section 1395dd(d)(2)(A) of the Emergency Act reads:

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, *obtain those damages available for personal injury under the law of the State in which the hospital is located,* and such equitable relief as is appropriate.

(Emphasis added.)

{25} We must also keep in view the Emergency Act's § 1395dd(f) preemption clause:

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

■ {26} It is important to note at the outset that Congress did not mention protective-state statutory schemes granting immunity to hospitals. We find nothing in the

Emergency Act that indicates that a particular hospital that comes within that Act's reach is to be spared as to liability. ' Nor do we find anything in its sparse legislative history suggesting that state immunity statutes might bar Emergency Act relief. *See* H.R.Rep. No. 241, 99th Cong.2d Sess., Pt. 3 at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 581, 605, 726; *Power,* 42 F.3d at 862 (noting that the legislative history is "sparse").

■ {27} The language in § 1395dd(d)(2)(A), "damages available for personal injury under the law of the State," however, raises the issue whether state immunity statutes are incorporated in the Emergency Act. Were that language absent, there would be no language in the Emergency Act even suggesting that the Emergency Act incorporated state tort immunity law. We do not believe that Congress intended to incorporate state statutory immunity into the Emergency Act as a limitation on "damages available for personal injury" or otherwise. Memorial agrees with this.

{28} Memorial nevertheless contends that the Tort Claims Act applies because Memorial is a government entity covered under the Tort Claims Act, and because the damages that Godwin seeks would be available in New Mexico, if at all, exclusively pursuant to the Tort Claims Act. Because the Tort Claims Act is the sole basis on which Godwin can seek any damages under New Mexico law, Memorial asserts, its provisions apply. *See Bird v. Pioneers Hosp.,* 121 F.Supp.2d 1321, 1323 (D.Colo.2000) (holding the Colorado Governmental Immunity Act applicable to Emergency Act claims in considering whether the state notice requirement conflicted with the Emergency Act's statute of limitations).

{29} While acknowledging that the Tort Claims Act "ordinarily would be the applicable statute," Godwin contends that the Tort Claims Act does not apply precisely because Memorial is immune from liability under the Tort Claims Act due to Dr. Boyd's status as a private employee of Health Services. According to Godwin, the Tort Claims Act simply never comes into play. The Emergency Act, not the Tort Claims Act, provides the

cause of action against Memorial. In addition, Godwin asserts that the preemption clause in the Emergency Act prohibits the application of the notice-of-claim and damages-cap provisions of the Tort Claims Act. Godwin argues that, just as Memorial's immunity under the Tort Claims Act cannot trump the Emergency Act, provisions of the Tort Claims Act such as the notice-of-claim and the damages-cap provisions cannot apply to limit or bar an Emergency Act claim.

{30} Under New Mexico law, the Tort Claims Act would be a hurdle to recovery of damages by Godwin for personal injury against Memorial. *See* § 41–4–2(A). Godwin cannot state a claim for relief against Memorial under the Tort Claims Act because Memorial is immune from liability under the Tort Claims Act. Yet to assert this immunity bar and thus the unavailability of any damages as a defense to Godwin's Emergency Act· claim is to attack the heart and soul of the Emergency Act—little more could defeat the purpose of the Emergency Act. *See Helton v. Phelps County Regional Med. Ctr.,* 817 F.Supp. 789, 791–92 (E.D.Mo.1993) (holding state law granting sovereign immunity to a hospital in direct conflict with and preempted by Emergency Act).

{31} Looking, then, to the notice-of-claim and damages-cap provisions themselves, we examine whether they should be applied to bar (notice of claim) Godwin's Emergency Act claim or limit (damages cap) his damages recovery.

### III. Applicability of the Tort Claims Act Notice–of–Claim Provision

■ {32} The Tort Claims Act requires a tort victim to give a written notice of claim within 90 days after an occurrence giving rise to the claim as a condition precedent to an action under that Act. *See* NMSA 1978, § 41–4–16(A) and (B) (1977). This notice-of-claim requirement operates as a statutory limitations period and failure to file a timely notice of claim is a statutory bar to suit. *See Marrujo v. New Mexico Highway Transportation Dep't,* 118 N.M. 753, 758, 887 P.2d 747, 752 (1994); *Ferguson v. New Mexico State Highway Comm'n,* 99 N.M. 194, 197,

656 P.2d 244, 247 (1982). It is undisputed that Godwin failed to give a written notice of claim within the 90–day period.

{33} Godwin's primary attack is twofold. He argues that the notice-of-claim requirement is a procedural limitation the likes of which Congress had no intention of incorporating into the Emergency Act through § 1395dd(d)(2)(A) or otherwise. He also argues that the requirement is preempted by the Emergency Act's two-year statute of limitations contained in § 1395dd(d)(2)(C). Godwin asserts that the Emergency Act's clear purpose is to allow victims of Emergency Act violations to vindicate a federal right, and that to permit the notice-of-claim bar would directly conflict with that purpose. He supports these arguments with several federal and state cases in which the courts have determined that state pre-conditions to suit are not incorporated in or are preempted by the Emergency Act. *See Power,* 42 F.3d at 865–66; *Reid v. Indianapolis Osteopathic Med. Hosp., Inc.,* 709 F.Supp. 853, 855–56 (S.D.Ind.1989); *Cooper v. Gulf Breeze Hosp., Inc.,* 839 F.Supp. 1538, 1543 (N.D.Fla.1993), *aff'd,* 82 F.3d 429 (11th Cir.1996); *HCA Health Servs. v. Gregory,* 596 N.E.2d 974, 977 (Ind.Ct.App.1992); *Parrish v. Brooks,* 856 S.W.2d 522, 526 (Tex.Ct.App.1993); *Smith v. Richmond Memorial Hosp.,* 243 Va. 445, 416 S.E.2d 689, 694–95 (1992). These cases primarily involve a state pre-suit administrative medical panel review requirement, often in company with a requirement of notice to the health care provider.

{34} Memorial relies for the most part on two federal cases that, Memorial contends, are more in point because they involve "simple notice statutes" like that in the Tort Claims Act, that is, simply a notice of claim requirement without an accompanying pre-suit medical panel review or other exhaustion or tolling requirement. *See Draper,* 9 F.3d at 1393, and *Hardy,* 164 F.3d at 792. Memorial explains that compliance with the 90–day notice requirement constitutes no obstacle to filing an Emergency Act action within two years—an Emergency Act victim can comply with the notice requirement and also meet the Emergency Act's two year limitation. Therefore, Memorial contends, there exists no direct conflict and, thus, no preemption. Memorial argues that *Hardy* and *Draper* are dispositive, and not those cases cited by Godwin which do not involve a "simple notice statute." Those cases, Memorial asserts, involve an exhaustion requirement, namely either alone or in tandem with a notice requirement that might cause a victim of an Emergency Act violation to miss the Emergency Act's two-year deadline.

{35} As additional support for his position, Godwin relies on *Felder v. Casey,* 487 U.S. 131, 153, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), which holds, under "[p]rinciples of federalism, as well as the Supremacy Clause," a state notice-of-claim requirement preempted with respect to a civil rights claim under 42 U.S.C. § 1983 brought in state court because it was "inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law." *Felder,* 487 U.S. at 153, 108 S.Ct. 2302. Memorial argues that *Felder* is distinguishable for the reasons elaborated in *Hardy,* 164 F.3d at 795, including the fact that § 1983 contains no preemption clause, and that the core purposes of § 1983 and the Emergency Act are different.

{36} Three Emergency Act provisions come into play. First is § 1395dd(d)(2)(A), creating a federal cause of action. That section specifically incorporates state law by permitting recovery of those damages available for personal injury under the law of the state in which the hospital is located. Second is § 1395dd(d)(2)(C), the Act's own statute of limitations. That section expressly gives the victim two years from the date of violation of the Emergency Act within which to file an Emergency Act claim. Third is § 1395dd(f), the Act's specific preemption clause. That clause says that the Emergency Act provisions "do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement" of the Emergency Act.

{37} The Emergency Act creates a federal cause of action intentionally distinct from state malpractice causes of action. We therefore look to the Emergency Act for the parameters of duty. The Act's preemption clause defers to compatible state law. This

deference presumably calls for the application of substantive state law on both proximate cause and damages. Yet the Act specifically incorporates the type and amount of damages available under state law—rather than leaving that issue to a preemption analysis. Nowhere in the Emergency Act is there a specific indication whether state procedural limitations on liability or access to the court are to apply.

{38} We are persuaded that the Tort Claims Act *90–day notice-of-claim requirement is preempted by* the Emergency Act. *Nothing* in the Emergency Act or its legislative history suggests an intent that the liability of a hospital for damages can be completely eliminated by state law, whether that elimination is pursuant to a complete, unconditional substantive sovereign immunity provision based on a unique hospital status under state law (namely, that of governmental entity sovereign immunity) or a complete but conditional procedural bar based on a unique hospital status (namely, that of governmental entity immunity resulting from an untimely notice of claim). Nor is there a suggestion in the law or history that a victim of an Emergency Act violation must pass any procedural muster other than compliance with the Act's two-year statute of limitations before filing an action for relief. The fact of the matter is that if failure to give a 90–day notice bars an Emergency Act claim, the two-year period given is taken away. The two-year limitations period in effect is reduced to 90 days or less and effectively vitiated. These circumstances create a direct conflict between the Tort Claims Act notice-of-claim requirement and the Emergency Act's statute of limitations and purposes.

{39} We hold that the Tort Claims Act notice-of-claim requirement is preempted by the Emergency Act and therefore not applicable to an Emergency Act claim.

## IV. Applicability of The Tort Claims Act Damages–Cap Provision

{40} Section 1395dd(d)(2)(A) of the Emergency Act allows recovery of "those damages available for personal injury under the law of the State in which the hospital is located." The Tort Claims Act expressly limits damages by placing a "cap" on damages recoverable under that act. *See* § 41-4-19.

{41} Although they do not involve statutes granting immunity like our Tort Claims Act, the more persuasive federal and state authority supports the view that state damages-cap provisions apply to Emergency Act claims. *See, e.g., Power,* 42 F.3d at 860-65; *Feighery v. York Hosp.,* 38 F.Supp.2d 142, 158 (D.Maine 1999) (holding patient's widow's Emergency Act claim subject to damages cap in Maine's wrongful death statute); *Reid,* 709 F.Supp. at 855-56 (holding that an award under the Emergency Act was subject to Indiana's limitation on maximum amount recoverable from a healthcare provider); *Lee by Wetzel v. Alleghany Reg'l Hosp. Corp.,* 778 F.Supp. 900, 903-04 (W.D.Va.1991) (holding that Emergency Act incorporates Virginia's cap in medical malpractice actions); *Barris v. County of Los Angeles,* 20 Cal.4th 101, 83 Cal.Rptr.2d 145, 972 P.2d 966, 976 (1999) (damages awarded under Emergency Act subject to medical malpractice cap in California).

{42} These courts found a congressional intent that recovery under the Emergency Act be based on the type and amount of personal injury damages available under the applicable state tort claim. *See Power,* 42 F.3d at 860; *Reid,* 709 F.Supp. at 855 (stating "[t]he legislative history . . . is completely silent on the question of whether the phrase 'those damages available for personal injury under the law of the state' should be read as including state limitations on medical malpractice damages," and concluding that to read the Emergency Act to not include damages caps "would render the statute's incorporation clause effectively meaningless").

{43} While that congressional intent appears to be based on a concern about recoveries against healthcare providers, *see Power,* 42 F.3d at 862 (discussing the House Committee on the Judiciary's concern with the potential impact of the Emergency Act's enforcement provisions on the current medical malpractice crisis); *Barris,* 83 Cal. Rptr.2d 145, 972 P.2d at 973 (stating that "the apparent intent of Congress was to balance the deterrence and compensatory goals

of [the Emergency Act] with deference to the ability of states to determine what limits are appropriate in personal injury actions against health care providers"), we see no reason to cut away as inapplicable a state damages-cap provision that applies generally to government entities such as that contained in the Tort Claims Act.

{44} Rather than directly conflict with the purposes of the Emergency Act, a state law limitation on damages is more reasonably read as being consistent with the words, "those damages available," in § 1395dd(d)(2)(A). *See Power*, 42 F.3d at 863–64 (finding it difficult to say that the cap " 'directly conflicts' with the goals of [the Emergency Act,]" and stating that "analyzing whether an [Emergency Act] claim would be deemed a [state] malpractice claim [with its applicable damages cap] ... best effectuates Congress's direction that courts should look to state law to determine what damages are available in an [Emergency Act] action."). A "preemption analysis is inappropriate when, as with § 1395dd(d)(2)(A), a federal statute expressly incorporates state law." *Id.* at 864.

{45} We hold that the "damages available" under New Mexico law against this government hospital are those "damages available" under the Tort Claims Act.

## V. The Emergency Act Issues of Appropriate Screening And Stabilization

### A. Appropriate Medical Screening— § 1395dd(a)

{46} Godwin contends that Memorial failed to appropriately screen him, in violation of § 1395dd(a), which reads:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for *an appropriate medical screening examination* within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(Emphasis added). Whether a violation of § 1395dd(a) has occurred is normally a question of fact. *See Ruiz v. Kepler*, 832 F.Supp. 1444, 1446 (D.N.M.1993); *see also Griffith v. Mt. Carmel Med. Ctr.*, 831 F.Supp. 1532, 1543 (D.Kan.1993) (noting most courts treat issue of appropriate screening as a question for the trier of fact).

{47} The purpose of the medical screening examination required by § 1395dd(a) is "to determine whether an 'emergency medical condition exists.' Nothing more, nothing less." *Collins v. DePaul Hosp.*, 963 F.2d 303, 306–07 (10th Cir.1992); *see Griffith*, 831 F.Supp. at 1538 n. 4 ("At a minimum, the statutory language requires the hospital to give a screening to determine whether an emergency medical condition exists."). The goal "is to determine whether a patient with acute or severe symptoms has a life threatening or serious medical condition," and the hospital must "develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." *Baber*, 977 F.2d at 879.

{48} The " 'appropriateness' of the screening [is not to] be determined by its adequacy in identifying the patient's illness," *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994), or its accuracy in diagnosis, *see Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir.1996). The screening is appropriate "[a]s long as a hospital applies the same screening procedures to indigent patients which it applies to paying patients." *Holcomb*, 30 F.3d at 117. It "is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms." *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir.1998).

### 1. Deviation From Standard Procedure

{49} Memorial asserts that it was entitled to summary judgment on the issue of appro-

priate medical screening. Memorial contends that, in order to prove his § 1395dd(a) claim, Godwin was required but failed to present evidence that it treated him differently in its screening process from other patients with similar conditions. Memorial cites cases from various jurisdictions that unequivocally state that a plaintiff suing under the Emergency Act must prove disparate treatment. *See, e.g., Marshall,* 134 F.3d at 323–24; *Vickers,* 78 F.3d at 143–44.

{50} Further, Memorial argues that any deviation in its care of Godwin from its standard screening process was de minimis. De minimis deviations cannot support liability for disparate treatment under the Emergency Act. *See Repp,* 43 F.3d at 523.

{51} Godwin asserts that the district court was correct in denying Memorial summary judgment. Godwin contends that he need show only a deviation as to him from a standard procedure. Godwin presented evidence that Memorial's standard procedure was to have a first level specialist in internal medicine or family practice on call. Subspecialists were on a consultation-call schedule for the first level specialists. A neurologist was available to consult with the internist or family practice doctor (who had been consulted by the emergency room physician on duty). Thus, Godwin asserts, the emergency department staff at Memorial was capable of consulting a neurologist pursuant to its standard procedure.

{52} Godwin also asserts that it was a standard procedure for the emergency room physician to conduct a basic neurological examination. He further asserts that it was Memorial's standard procedure for nurses to follow a specific spinal cord protocol to screen for potential spinal cord injuries.

{53} Godwin contends that Memorial failed to follow its standard procedures and argues that these lapses raise a genuine issue of fact whether Memorial failed to provide an appropriate medical screening examination while he was in the hospital on August 23. He argues that Dr. Boyd knew that Godwin should see a neurologist, but did not initiate its procedure to obtain a neurological consultation. He further argues that Dr.

Boyd failed to note anything in the medical records regarding a standard neurological examination. In addition, Godwin argues that no one in the emergency department initiated a spinal cord protocol.

{54} Godwin also raises various other failures by Memorial, including the failures of nurses to give a neurological assessment and to mark the "neuro" section on the medical form. Further, he complains of the failure of the discharge nurse to assess or note the deterioration of his neurological condition which seemed apparent when he left the emergency room in a wheelchair.

{55} As did the district court, Godwin relies on *Ruiz,* 832 F.Supp. at 1449, and *Repp,* 43 F.3d at 522, for the proposition that "a hospital defines which procedures are within its capabilities when it establishes a standard screening policy for patients entering the emergency room" and "violates section 1395dd(a) when it does not follow its own standard procedures." Looking to *Ruiz* and *Repp,* the district court determined that "[d]isparate treatment is not required."

{56} Memorial contends that *Repp* and *Ruiz* are early, outdated authority that incorrectly interpret § 1395dd(a) to eliminate Godwin's burden to establish a prima facie case showing that Memorial actually treated him differently than other patients having similar medical conditions. Memorial argues that not every neurological involvement requires a neurological consultation. It asserts that Godwin failed to present any evidence specifically showing that persons with a history and symptoms the same as his received a different screening procedure, or that the consultation procedure that Godwin asserts was a standard one was used for others who had the same type of back pain and numbness that Godwin had.

{57} The distinction in the case law on the issue of disparate treatment appears to us to quietly center on the claimant's proof burden. *Compare Repp,* 43 F.3d at 522; *Ruiz,* 832 F.Supp. at 1447 n. 4; *Romo v. Union Mem'l Hosp., Inc.,* 878 F.Supp. 837, 841–42 (W.D.N.C.1995) (stating that "the fact that certain routine procedures . . . were allegedly not followed suggests disparate treatment and may prove to be evidence of an inappro-

priate screening under" the Emergency Act); *C.M. v. Tomball Reg'l Hosp.*, 961 S.W.2d 236, 241–42 (Tex.App.1997); *with Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir.1994) (holding that "[t]o prevail on its summary judgment motion, the hospital was not required to disprove the Williamses' claim by showing all patients were treated the same").

{58} Reading the "appropriate screening" cases together we do not see a hard division between deviation from a standard procedure and disparate treatment. We see rather linguistic confusion that is resolved by clarifying the proof burden. A plaintiff will rarely know of how patients that preceded him in the emergency room were treated. The plaintiff's Emergency Act action will likely be based only on knowledge of the existence of and deviation from a standard procedure. We do not think it required that, in order to survive a motion for summary judgment, a plaintiff with a medical condition for which a standard screening procedure is in place must actually show that he was treated differently than other patients having the same or similar conditions.

{59} In reducing the cases to their common denominator, we conclude that a plaintiff's proof of the existence of a standard screening procedure for a person presenting a medical condition, and of a deviation from that standard screening procedure with respect to that person, is a prima facie showing of inappropriate screening sufficient to defeat a motion for summary judgment. "[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures." *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991) (holding that "any departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act").

{60} At trial, a plaintiff can attempt to solidify that showing with evidence obtained through discovery of actual cases in which that standard procedure was followed for other persons with similar medical conditions. The hospital as a defendant can present evidence that as to the plaintiff the screening procedure was followed, or that the plaintiff received the same treatment as other patients with similar medical conditions.

## 2. Result

{61} The evidence that Dr. Boyd did not seek a neurological consultation through an on-call internist did raise a genuine issue of material fact as to appropriate medical screening and alone is sufficient to save Godwin from summary judgment. Godwin presented evidence that would permit a jury to infer that a neurological consultation was part of Memorial's standard screening procedure. Dr. Boyd acknowledged that Godwin's weakness in his legs was a significant development from his initial evaluation that day. He also testified that he could have consulted with medical staff at the University of New Mexico or have ordered an MRI. The on-call Memorial internist, Dr. Holloman, testified that in his usual work routine, were he to be consulted by the emergency room physician regarding a patient with a neurological problem, and were he to determine that the patient had an unexplained weakness in an extremity, he would refer the patient to a neurologist.

{62} Although there exists some question as to its application as part of a standard procedure to screen Godwin's condition, Godwin also presented evidence that a nurse's spinal cord protocol existed. He further showed that the development of weakness in a leg following trauma to the back must be considered an emergency; and that a neurological consultation was warranted on August 23, 1994. In addition, through the affidavit of Michael R. Swenson, MD, Professor and Chair of the Department of Neurology at the University of Louisville, Kentucky, Godwin showed that "the sudden onset of an acute neurological sign of leg weakness following trauma to the back must be considered an emergency and evaluated until a diagnosis is established or a suitable referral or consultation done on an emergency basis," that "[a]n adequate screening evaluation for a patient who develops leg weakness following trauma to the back would include a standard neurological physical examination, which is performed by the physician," that "[t]he emergency physician should have ordered an MRI

of the spinal cord to find or rule out a compressing lesion as part of the screening examination," and that "[t]he emergency physician should have made arrangements to have Mr. Godwin seen by a neurologist or neurosurgeon on an emergency basis since he was not able to make a definitive diagnosis as to the cause of the back pain and leg weakness." Another expert, George R. Schwartz, MD, an emergency physician, concurred with Swenson, adding that the August 23 screening was "not appropriate."

{63} In the face of this evidence, Memorial contends that the process of deciding whether to obtain neurological consultation is not to be considered a part of the "appropriate screening procedure" contemplated under the Emergency Act, but it is rather a discretionary function based on a medical-on-the-spot judgment call that a physician must make in each individual case. Such judgment calls, Memorial contends, if negligently made, may constitute malpractice, but cannot constitute a failure to appropriately screen a patient under the Emergency Act. Even were it an issue of "appropriate medical screening," Memorial further contends, it is clear that, as a matter of law, Dr. Boyd acted appropriately and within the requirements of the Emergency Act by advising Godwin to see a neurologist as soon as possible.

{64} It is true that, in regard to screening, liability must be based on "more than a mere misdiagnosis." *Griffith*, 831 F.Supp. at 1542; *see also Gatewood*, 933 F.2d at 1041 ("[Plaintiff's] allegations of misdiagnosis, without more, are ... not cognizable.... Absent some allegation of differential treatment, no claim is stated under subsection 1395dd(a)."). A failure to examine or test pursuant to a standard screening procedure might support a medical malpractice claim under State law and at the same time "also constitute evidence of differential treatment sufficient to support a claim for failure to give an 'appropriate medical screening' under [the Emergency Act]." *Griffith*, 831 F.Supp. at 1543.

{65} That Dr. Boyd knew of neurological involvement but remained unaware of its etiology might implicate medical malpractice law. However, if Dr. Boyd diagnosed neurological involvement but failed to follow through with all facets of Memorial's standard procedure in addressing the neurological condition, the Emergency Act is implicated. *See, e.g., Scott v. Hutchinson Hosp.*, 959 F.Supp. 1351, 1357 (D.Kan.1997) (holding that in the absence of evidence that a hospital did not follow its standard screening procedure, summary judgment is proper as to an inappropriate screening claim); *see also Lane*, 846 F.Supp. at 1551 (holding that "if a hospital acts consistently with its standard screening procedures [it is not liable] even if those procedures are deficient under state medical malpractice law").

{66} We cannot say as a matter of law that the failure to obtain a neurological consultation was a decision to be measured solely by a medical negligence standard and not pursuant to an appropriate medical screening standard. The spheres of medical malpractice and failure to provide an appropriate medical screening may overlap.

{67} We agree with the district court that Godwin has presented sufficient evidence from which a jury could infer that failing to obtain a neurological consultation under the circumstances in this case was a violation of the appropriate screening examination requirement in § 1395dd(a). We are, therefore, not prepared to say that no genuine issue of material fact exists as to whether Memorial failed to have and to apply an appropriate screening examination under the Emergency Act. *See Griffith*, 831 F.Supp. at 1540–43 (holding evidence presented sufficient to raise a question of fact as to whether screening was appropriate); *Romo*, 878 F.Supp. at 841 n. 1 (deciding that although evidence "is, at first glance, somewhat scant," and "apparently the only significant indicator of differential treatment ..., it is apparently a very significant one" and denial of summary judgment was appropriate).

## B. Stabilization of Emergency Condition— § 1395dd(b)

{68} Godwin alleges that Memorial discharged him when his emergency condition was not properly stabilized, in violation of the Emergency Act. He asserts that this is

an issue requiring jury determination. According to Godwin, §§ 1395dd(b)(1)(A) and (B) required Memorial to provide him either "such further medical examination and such treatment as may be required to stabilize the medical condition" before discharge, § 1395dd(b)(1)(A), or to transfer him to another medical facility in accordance with § 1395dd(c). *See* § 1395dd(b)(1)(B).

■ {69} "To stabilize," with respect to an emergency medical condition, is

to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer [or discharge] of the individual from a facility.

Section 1395dd(e)(3)(A); *see* § 1395dd(e)(4) ("Transfer" includes "discharge."). An emergency medical condition is

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part.

Section 1395dd(e)(1)(A). Thus, in addition to the duty to provide an appropriate medical screening examination, the Emergency Act imposes a duty to stabilize an emergency medical condition before discharging the patient. *See, e.g., Collins,* 963 F.2d at 307–08. Simply stated, Memorial was required to provide such further medical examination and treatment as was required to medically treat an emergency medical condition.

{70} Memorial asserts that it was entitled to summary judgment on this issue. Memorial contends that it cannot be liable under the Emergency Act for failing to stabilize unless it had *actual* knowledge of the existence of a specific emergency medical condition. Most cases on this issue support this position. *See, e.g., Marshall,* 134 F.3d at 325; *Brodersen v. Sioux Valley Mem'l*

*Hosp.,* 902 F.Supp. 931, 944 (N.D.Iowa 1995); *Barris,* 83 Cal.Rptr.2d 145, 972 P.2d at 971–72. Godwin does not disagree.

{71} There exists no dispute that on August 23, 1994, Godwin had a subdural hematoma and that this condition constituted an emergency medical condition. However, no evidence establishes that Memorial had actual knowledge of that specific condition. Nevertheless, referring to the Emergency Act, Godwin contends that stabilization was required for what he contends was an emergency condition that was manifested through symptoms presented to the hospital whether or not the hospital was aware of the subdural hematoma. *See* § 1395dd(e)(1)(A) (defining an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" serious impairment or dysfunction or health jeopardy).

{72} The record reflects Memorial's actual knowledge that Godwin suffered a traumatic injury resulting in severe back pain with weakness and numbness in one of his legs of undiagnosed etiology, and also Memorial's actual knowledge that this was a condition that required the attention of a neurologist. Godwin argues that these circumstances constituted "an unstable emergency medical condition" sufficient for jury consideration. He concludes that "[r]ecognizing ... whether a hospital knows a patient has an emergency medical condition" is a jury issue.

■ {73} All this being said, as interesting and important as this issue may be, we fail to see how, in this case, the stabilization requirement in the Emergency Act is implicated. The stabilization requirement is "triggered" only when an emergency medical condition is detected in the screening process. *See* § 1395dd(a) and (b)(1). The stabilization provision does not apply unless it is first determined that an emergency medical condition exists. *See Urban v. King,* 43 F.3d 523, 525–26 (10th Cir.1994); *Marshall,* 134 F.3d at 321. Godwin was discharged before any emergency medical condition was diag-

nosed. We therefore never reach the stabilization issue.

## CONCLUSION

{74} We hold that Godwin's claim for violation of § 1395dd(a) (failure to provide an appropriate medical screening examination) is for jury determination. The Tort Claims Act's notice-of-claim bar does not apply to that claim. The Tort Claims Act's damages-cap provision does apply to that claim. We remand for proceedings consistent with this opinion.

{75} **IT IS SO ORDERED.**

I CONCUR: MICHAEL D. BUSTAMANTE, Judge.

LYNN PICKARD, Judge (concurring in part and dissenting in part).

PICKARD, Judge (concurring in part and dissenting in part).

{76} I concur in most of the Court's opinion, but respectfully dissent from the holding that the Emergency Act preempts the notice-of-claim requirement of the Tort Claims Act. I am convinced by the language of the Emergency Act that Congress intended to supplement, not supplant, state tort law and that the notice-of-claim provision does not directly conflict with any provision of the Act or frustrate the Act's remedial purpose.

{77} Whether a federal law preempts a state statute is generally a question of congressional intent. *Srader v. Verant*, 1998-NMSC-025, ¶ 7, 125 N.M. 521, 964 P.2d 82. When Congress has included a provision expressly defining the preemptive reach of a statute, and when that provision provides "a reliable indicium of congressional intent with respect to state authority," a court may infer that Congress did not intend to impliedly preempt matters beyond the scope of the express provision. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)) (internal citations omitted). While this inference does not obviate the need for conflict-preemption analysis, it does inform and limit our inquiry.

*See Freightliner Corp.*, 514 U.S. at 288, 115 S.Ct. 1483. Section 1395dd(f) expressly limits the preemptive effect of the Emergency Act. *See id.* ("The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section."). In reviewing the preemptive effect of the Emergency Act on the notice-of-claim requirement, therefore, we look to see whether the notice requirement "directly conflicts" with the Act. I am convinced that it does not.

{78} A state law is in direct conflict with federal law where (1) it is "impossible for a private party to comply with both state and federal requirements," *English v. General Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). As the majority acknowledges, a plaintiff seeking to assert an Emergency Act claim against a state medical services provider may comply with both statutes. While it is true that failure to comply with the notice requirement will bar future action against the state, under no circumstances will compliance with New Mexico's simple notice requirement preclude compliance with the Emergency Act's two-year statute of limitations. *See* § 41–4–16; 42 U.S.C. § 1395dd(d)(2)(C). The test for preemption is not whether noncompliance is possible, but whether compliance with both statutes might be impossible. *Draper*, 9 F.3d at 1393; *see English*, 496 U.S. at 79, 110 S.Ct. 2270.

{79} Federal and state cases addressing the potential conflict between state notice-of-claim statutes and the Emergency Act have uniformly turned on whether compliance with both laws was possible. *Compare Power*, 42 F.3d at 866 (holding that Virginia's requirement that suits cannot be filed until after they are reviewed by a malpractice review panel directly conflicts with the Emergency Act given that review could take longer than two years and state law tolling provisions cannot toll the running of the Emergency

Act's two-year statute of limitations); *Parrish*, 856 S.W.2d at 526 (holding that grace period allowed under Texas state law could not toll Emergency Act's statute of limitations); *Reid*, 709 F.Supp. at 855 (holding that Indiana Code's provision that no cause of action against a healthcare provider arises until an opinion has been rendered by a medical review panel directly conflicts with Emergency Act provision that cause of action arises when individual is harmed by hospital's violation of the Act), *with Draper*, 9 F.3d at 1393 (holding that Oregon's one-year tort claim notice requirement neither precludes compliance with the Emergency Act nor stands as an obstacle to the purpose of the Act, but simply addresses a historical concern that governmental bodies have prompt notice of the claims against them); *Hardy*, 164 F.3d at 794–95 (holding New York's 90–day notice-of-claim requirement not preempted by the Emergency Act because neither directly conflicting with the Act nor unduly burdensome). Like the statutes at issue in *Draper* and *Hardy*, the only two cases directly on point, New Mexico's notice-of-claim requirement is a simple notice statute without any procedural conditions that could run afoul of the Emergency Act.

{80} Although notice statutes do operate like statutes of limitations since they are conditions precedent to filing suit, the purpose and scope of the two laws are notably different. *See Ferguson*, 99 N.M. at 197, 656 P.2d at 247. The purposes of a notice requirement are (1) to allow investigation of a matter while the facts are accessible, (2) to question witnesses, (3) to protect against simulated or aggravated claims, and (4) to consider whether to pay the claim or refuse it. *Id.* at 196, 656 P.2d at 246. The written notice required by Section 41–4–16(A) is limited to the time, place, and circumstances of the loss or injury. Nothing more is required. By contrast, a statute of limitations requires that a lawsuit be commenced within the applicable period. The requirements for filing the lawsuit are significantly more cumbersome than the requirements for giving notice. *Compare* Rules 1–008 through 1–011

NMRA 2001 (form and content of pleadings) *with* § 41–4–16(A).

{81} Furthermore, the notice requirement does not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 61 S.Ct. 399. The purpose of the Emergency Act is to prevent "patient dumping," the practice of refusing emergency medical treatment to patients without insurance or who are unable to pay for services. *Power*, 42 F.3d at 856. New Mexico's notice-of-claim requirement does not stand as an obstacle to this purpose. Rather, it "simply addresses a concern that the [Emergency] Act does not, namely the historical concern of governmental bodies that they be given reasonably prompt notice of tort claims against them." *Draper*, 9 F.3d at 1393.

{82} In addition, I disagree with the majority's reliance on *Felder*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123. In my view, *Felder* does not support the proposition that a state notice-of-claim statute is necessarily preempted by a federal statute creating a federal cause of action. The statute at issue in *Felder*, namely 42 U.S.C. § 1983, is notably different from the Emergency Act. Section 1983 was enacted to hold state actors liable for violating an individual's federal civil rights. *See Felder*, 487 U.S. at 139, 108 S.Ct. 2302. In reaching its conclusion that 42 U.S.C. § 1983 preempted state notice statutes, the Court relied on the inherent conflict between the purpose of the statute and a state law requirement that a victim seek redress from the offending state. *Felder*, 487 U.S. at 141, 108 S.Ct. 2302. The Court also noted that, given the unique nature of civil rights violations, plaintiffs may be unaware of the merit of their claim for some time. *Id.* at 146 n. 3, 108 S.Ct. 2302. An Emergency Act claim, on the other hand, is not as amorphous. Finally, unlike the Emergency Act, 42 U.S.C. § 1983 does not include a provision limiting the scope of the statute's preemption of state law. *Compare* 42 U.S.C. § 1395dd(f) *with* 42 U.S.C. § 1983.

{83} As I conclude that the notice requirement is not preempted, I must address the issue of whether factual questions exist re-

garding compliance with it. I agree with the trial court that genuine issues of fact exist.

{84} For the foregoing reasons, I respectfully dissent from the Court's holding that the Emergency Act preempts the notice-of-claim requirement. With the exception of my disagreement with this preemption issue, I fully concur in the remainder of the opinion.